IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ULTURA (LA) INC., et al.,[1] | ) | Case No. 14-12382 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**Hearing Date: TBD**
**Objection Deadline: TBD**

**ULTURA (OCEANSIDE) INC.'S MOTION FOR ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL ASSETS OF ULTURA (OCEANSIDE) INC. OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), 363(f) AND 363(m); (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Ultura (Oceanside) Inc., one of the above-captioned the debtors ("Oceanside" or the "Seller"), files this motion (this "Sale Motion") for entry of an order: (a) approving the *Asset Purchase Agreement* dated October 20, 2014 between Oceanside, as seller, and UAC Finance, Inc. (the "Purchaser"), as buyer (the "Agreement," a copy of which is attached hereto as **Exhibit A**),[2] authorizing the sale (the "Sale") of substantially all the assets of Ultura (Oceanside) Inc. (the "Acquired Assets"); (b) authorizing the sale of the Acquired Assets free and clear of all liens, claims, rights, encumbrances, and other interests pursuant to sections 105, 363(b), 363(f), and 363(m) of the Bankruptcy Code; and (c) granting related relief.

Concurrently herewith, the Seller is filing *Ultura (Oceanside) Inc.'s Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All Assets of Ultura (Oceanside) Inc.; (B)*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ultura (LA) Inc. (9624) and Ultura (Oceanside) Inc. (6429). The mailing address for each of the Debtors is: 3605 Long Beach Blvd., Suite 201, Long Beach, CA 90807.

[2] All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

*Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C)  Approving Payment of a Break-Up Fee; and (D) Granting Related Relief* (the "Bidding Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bidding Procedures").

In support of this Sale Motion, the Seller respectfully states as follows:

### Preliminary Statement

1.      By this Sale Motion, the Seller seeks approval of the sale (the "Sale") of the Acquired Assets of the Seller, to the Purchaser pursuant to the Agreement or to the highest and best bidder for such assets at the auction provided for in the Bidding Procedures Motion and the Bid Procedures (the "Auction"), to take place in accordance with the order to be entered by the Court on the Bidding Procedures Motion (the "Bidding Procedures Order").  The proposed Agreement contemplates that the Acquired Assets will be sold free and clear of liens, claims, encumbrances, rights, and other interests other than those liens and interests expressly permitted under the Agreement.

2.      As discussed below, the Seller's sale process is in the best interests of the Seller and its estate and creditors.  The Sale will provide for either the payment or assumption of all known trade claims against the Seller (up to a cap of $585,000, which is expected to pay all trade claims in full), through the proposed acquisition of the Acquired Assets pursuant to the credit bid of the Purchaser and the assumption of liabilities provided under the Agreement.  Further, given the financial condition of the Seller, the lack of any meaningful working capital, a sale under these conditions is in the best interest of the Seller, its estate and creditors.

2

## Jurisdiction

3.     This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

4.     Venue of these proceedings and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory predicates for the relief sought herein are sections 105, 362, 363,

364, 365, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

## Background

6.     On October 20, 2014, the Seller and its affiliate, Ultura (LA) Inc. ("LA") each

commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  The Debtors have continued in the possession of their property and have

continued to operate and manage their businesses as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

7.     The factual background relating to the commencement of the Debtors' chapter 11

cases (the "Chapter 11 Cases") is set forth in detail in the *Declaration of Grant Lyon in Support

of First Day Motions* (the "Lyon Declaration") and incorporated herein by reference.

## Sale of the Acquired Assets

8.    The Seller seeks approval of the sale of substantially all of its assets used in the operation of its "Membrane Business," which is located in Oceanside, California. The Seller is a membrane development, manufacturing, and process application company that produces 37 different membranes, each with its own specialized flux and rejection characteristics. Each membrane can be assembled into a variety of elements and modules. As a result, the Seller has over 400 SKUs, of which more than 150 are currently active. The membrane products are marketed under the Rochem® and Sepro™ brands. On October 16, 2014, Seller purchased certain intellectual property owned by Ultura Inc. necessary for the operation of Seller's business in exchange for $250,000, and which intellectual property is included in the Acquired Assets. The Seller's products are used in a variety of applications, including marine desalination systems, landfill leachate systems, dairy applications, automobile paint line and a multitude of other difficult-to-treat membrane applications.

9.    In light of (i) the extensive marketing process already undertaken, (ii) the additional efforts that will be made during the proposed sale process, and (iii) the current liquidity issues facing the Seller, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to the Purchaser or to such other party who submits a higher and better offer for the Acquired Assets (a "Successful Bidder") under the terms of the Agreement. Pursuant to the Agreement and the DIP Order, the Seller must obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") no later than November 6, 2014, obtain a bid deadline no later than November 25, 2014, conduct an auction

4

no later than December 3, 2014, obtain an order approving the Sale no later than December 5, 2014, and close such Sale no later than December 12, 2014 (to the extent Purchaser waives the requirement that the Sale order becomes a final order; however, if Purchaser does not waive such requirement, then such date shall be December 23, 2014).  In light of the prepetition marketing efforts, and based upon the financial condition of Seller's business, the Seller believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.

### Marketing Process

10.     As part of the Seller's restructuring efforts, the Seller determined to undergo a sale process for all or a part of its business lines. Significant efforts were undertaken by both the Seller and Wedbush Securities Inc. to market the Acquired Assets.  The potential sale was featured in an article in Global Water Intelligence ("GWI"), an industry publication, on July 14, 2014.

11.     On July 1, 2014, the Seller also engaged Wedbush Securities, Inc. ("Wedbush") to sell, among other assets, the Membrane Business.  Wedbush prepared marketing materials, including an executive summary ("Teaser") and a management presentation, and an online data site with diligence materials.  Wedbush distributed approximately 175 Teasers to industry participants, strategic and financial investors, and other potential buyers.  Approximately 60 parties returned executed confidentiality agreements and were provided with access to the online data site.

5

12.     On August 7, 2014, Purchaser acquired the Sellers' outstanding secured indebtedness, and subsequently submitted the only bid for Ultura Oceanside's assets -- the Membrane Business.  Oceanside began an extensive negotiation with the Purchaser relating to the potential sale and, beginning in late September 2014, Wedbush also re-approached 19 of the potential strategic buyers that had indicated the most interest for a stand-alone Membrane Business.  No party submitted an offer for the Membrane Business at the time the negotiations were occurring with Purchaser.

13.     Ultimately, after extensive negotiations, Oceanside and the Purchaser entered into the Agreement, which is attached hereto as **Exhibit A**.  As noted above, the consideration for the purchase of the Acquired Assets under the Agreement is (i) the assumption or payment of all known trade claims against the Seller up to a cap of $585,000 (which is estimated to equal 100% of trade claims); and (ii) Purchaser's credit bid against the DIP Loan and a portion of the Prepetition Loan as described below.

*Secured Debt Obligations Owing to Purchaser*

14.     Prior to the Petition Date, the Debtors and certain affiliates entered into a loan (the "Prepetition Loan") with Hercules Technology Growth Capital, Inc. ("Hercules") evidenced by, among other things, the following documents, instruments, and agreements (collectively, the "Prepetition Loan Documents"):  (i) Loan and Security Agreement dated as of September 29, 2013, by and between APTwater, Inc. (n/k/a Ultura Inc.) and Hercules; (ii) Joinder Agreement dated as of September 9, 2013, by and between Rochem Membrane Systems, Inc. (n/k/a LA) and Hercules; (iii) Joinder Agreement dated as of November 15, 2013, by and between Sepro

6

Membranes, Inc. (n/k/a Oceanside) and Hercules; (iv) Amendment to Loan ("First Loan Amendment") dated as of July 4, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Hercules; and (v) Second Amendment to Loan Agreement ("Second Loan Amendment") dated as of August 25, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Purchaser.[3] The Loan and Security Agreement and the Joinder Agreement granted Hercules a security interest against substantially all assets of the Debtors, including but not limited to the Receivables, Equipment, Fixtures, General Intangibles, Inventory, Investment Property of the capital stock of any Foreign Subsidiary that constitutes a Permitted Investment, Deposit Accounts, Cash, Goods (each as defined in the Prepetition Loan Documents), and all other tangible and intangible personal property of the Debtors, including all proceeds of the foregoing. The collateral described in this paragraph is referred to herein as the "Prepetition Collateral."

15.    Pursuant to that certain Loan Sale Agreement dated as of August 7, 2014, by and between Hercules and Purchaser, Hercules transferred to Purchaser all of its right, title, and interest in, to, and under the Prepetition Loan and the Prepetition Loan Documents. Thereafter, as set forth below, Purchaser agreed to continue funding Oceanside's operations pursuant to the terms of the Second Loan Amendment.

---

[3]  In 2011, Ultura, Inc. acquired Rochem AG ("Rochem"). Rochem had over forty years of experience in the leachate and marine solutions business. As part of its efforts to acquire Rochem, Ultura Inc. embarked on an effort to raise capital through the issuance and sale of Series C Preferred Stock. On or about September 8, 2011, Ultura Inc. and True North Ventures, Inc. ("True North"), a venture capital fund and affiliate of UAC, entered into a stock-purchase agreement pursuant to which True North purchased approximately $23.5 million of Ultura Inc. preferred stock and took a seat on Ultura Inc.'s board of directors which was subsequently relinquished. The amount owing to True North in connection with its investment with Ultura, Inc. to finance the Rochem acquisition was eventually converted into secured indebtedness (the "Exchange Notes") against Ultura, Inc. to resolve litigation between Ultura Inc. and True North. The Exchange Notes held by True North are not asserted against the Debtors.

16.     Purchaser advised the Debtors that, based upon various defaults, the financial

liquidity issues of the business, and the ongoing need for funding, Purchaser was unwilling to

advance additional funds unless certain changes were made to the management of the business.

Pursuant to the Second Loan Amendment, Purchaser agreed to continue funding the Debtors'

operations upon the creation of a three-member restructuring committee (the "Restructuring

Committee") with broad authority to direct matters relating to the restructuring of Oceanside.

Purchaser identified Grant Lyon and Michael Carmel as two potential members of the

Restructuring Committee, which were acceptable to Ultura Inc. and Oceanside.  The third

member of the Restructuring Committee is Randall Blank, who has been serving as a director of

Oceanside's ultimate parent, Ultura Inc.  Grant Lyon is also the President and Chief Executive

Officer of LA and the President of Oceanside.[4]

17.     The Purchaser is also the proposed postpetition lender pursuant to the Motion of

Debtor Ultura (Oceanside) Inc. for Interim and Final Interim Orders under 11 U.S.C. §§ 105,

361, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtor To

(A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens

and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection;

(IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing (the "DIP Motion"),

filed concurrently herewith.  The DIP Motion seeks, inter alia, approximately $2,262,077 in

postpetition financing (the "DIP Loan") in order to fund Oceanside's chapter 11 case.  Oceanside

is in need of this postpetition financing and continues to operate with a very thin working capital

---

[4]  The Restructuring Committee was also created at Ultura Inc.

8

reserve, especially with the increased restructuring costs associated with the chapter 11 case. It is in the best interest of the company and its stakeholders to expedite the sales process in this case. Because of liquidity constraints, the Seller has not been able to inject much needed capital to grow the business. As a result the Seller has been susceptible to competitive pressures which has affected its operating performance.

### Continued Sale Process

18.    While the prepetition marketing and sale process was thorough, as discussed above, the Seller will send, or will have sent, notice of the Sale Motion and Bidding Procedures to all parties that the Seller believes may be potentially interested in acquiring the Acquired Assets. The Seller will also maintain its electronic data room with key documents and company-specific information in order to streamline the due diligence process going forward. The data room has been, and will be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Seller. The Seller will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Acquired Assets. The Seller will also continue to use Wedbush as its investment banker to solicit any further offers for the Acquired Assets.

19.    The Seller believes that the consummation of the Sale to the Purchaser or other Successful Bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Acquired Assets.

20.    The material terms of the Agreement with the Purchaser are set forth below. Pursuant to the terms of the Agreement and subject to entry by the Court of an order

9

substantially in the form attached hereto as **Exhibit B** (the "Sale Order"), the Purchaser, subject

to higher or better bids, will purchase all of, or substantially all of, the Seller's assets.

### Agreement With Purchaser[5]

21.    The key terms of the Agreement and the Sale Order are summarized below.  The

description below only summarizes certain provisions of the Agreement and the Sale Order as a

convenience to the Court and parties in interest, and the terms of the Agreement control in the

event of any inconsistency.

        a.    **Purchase Price and Credit Bid**.  The total consideration to be paid by
Purchaser to Seller for the Acquired Assets shall be $25,000,000 (the "Purchase Price"), which is
comprised of (i) a credit bid amount equal to all outstanding obligations owed by Seller to
Purchaser under the DIP Loan; (ii) a credit bid of a portion of the obligations owing under the
Senior Secured Loan; and (iii) the assumption of up to $585,000 of Assumed Liabilities under
the Agreement.  Included in the Assumed Liabilities are the costs required to assume and assign
the designated executory contracts and unexpired leases included in the Acquired Assets (the
"Assigned Contracts") as such costs are established under the order approving the Bid
Procedures Motion.  *See* Agreement, § 3.1.

        b.    **Purchased Assets**.  The Acquired Assets (inclusive of the Assigned
Contracts) are those assets necessary to operate Sellers business including, but not limited to, the
Seller's inventory, fixed assets, the Assigned Contracts, intellectual property, transferable license
agreements and software agreements, accounts receivable, avoidance action claims against the
Seller's vendors (the "Vendor Claims"), the capital stock of non-debtor Ultura Sales GMBH
owned by the Seller and copies of the Seller's books, records and files.  *See* Agreement, § 2.1(a).
The Acquired Assets do not include the Excluded Assets.  The Excluded Assets are set forth in
section 2.1(b) of the Agreement, and include:  the Seller's cash and cash equivalents, pre-Closing
tax refunds, rebates and credits owed to the Seller, insurance proceeds, claims and causes of
action for non-Assigned Contracts or property not included as Acquired Assets, the non-
Assigned Contracts, the capital stock of any other entity (other than Ultura Sales GmbH; tax
records, minute and stock transfer books, existing letters of credit or financial accommodations
issued to third parties, claims against the Seller's former and current directors and officers, and
Seller preference and avoidance actions (other than the Vendor Claims).

        c.    **Closing**.  Subject to the terms and conditions of this Agreement, the
closing of the purchase and sale of the Acquired Assets (the "Closing") will be at 10:00 a.m.
Eastern Daylight Time at the offices of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,

---

[5] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed in the Agreement.

One Financial Center, Boston, Massachusetts 02111, or at such other location agreed to by Purchaser and Seller, on the fifth (5th) Business Day following the date of the issuance of the Approval Order, but not later than December 12, 2014 (to the extent Purchaser waives the requirement that the Sale order becomes a final order; however, if Purchaser does not waive such requirement, then such date shall be December 23, 2014), or such other date as may be agreed upon by the Parties. See Agreement, at § 4.1.

      d.    **Deposit.** Because the consideration provided by the Purchaser consists entirely of is a credit bid and assumption of liabilities, there is no deposit provided by the Purchaser in connection with the sale of the Acquired Assets.

      e.    **Identity of Purchaser.** As noted above, Purchaser purchased the Seller's existing senior secured debt from Hercules Technology Growth Capital, Inc. (the "Senior Secured Indebtedness") on or about August 8, 2014. The Purchaser is the current owner of the Senior Secured Indebtedness, which totaled approximately $24,331,905 as of the Petition Date. The Purchaser also agreed to provide postpetition financing of approximately $2,262,077 in order to fund the Debtors' Chapter 11 Cases through the closing of the Sale, as more fully set forth in the DIP Motion. As set forth herein, all known trade claims (subject to a cap of $585,000 against the Seller will be paid or assumed under the Agreement.

      f.    **Assumption of Executory Contracts and Unexpired Leases.** The proposed sale contemplates that the Seller may assume and assign to the Purchaser certain of the executory contracts and unexpired leases associated with the Acquired Assets. The schedule (or schedules) of the executory contracts and unexpired leases that the Purchaser may elect to be assumed by the Seller and assigned to the Purchaser at the Sale Hearing (the "Assigned Contracts"). The Purchaser shall be permitted to add or delete contracts and leases to/from the list of Assigned Contracts up until the deadline to submit competing bids for the Acquired Assets that is approved by the Court.

      g.    **Break Up Fee.** Subject to approval of the Bankruptcy Court, in consideration for the Purchaser having expended considerable time and expense in connection with the Agreement and the negotiation thereof and to compensate Purchaser as a stalking-horse bidder, in the event that the Seller consummates an alternative transaction instead of the proposed Sale to the Purchaser under the terms of the Agreement, or to the extent of a default by the Seller under the Agreement, the Seller shall pay Purchaser a breakup fee equal to 3% (i.e., $750,000) of the Purchase Price (the "Break Up Fee"). See Agreement, §§ 1.1 and 11.2(b).

      h.    **Representations, Warranties and Covenants.** The Seller Parties made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, financial statements, absence of changes, authorized capitalization, compliance with laws, licenses, environmental matters, title to assets, contracts, litigation, contracts to be assumed and assigned to the Purchaser, intellectual property, software, taxes, broker's and finder's fees, operation of the Business prior to the Closing, and insurance. See Agreement, at §§ 6.1 – 6.4. The Purchaser has made certain representations, among others, relating to organization and good standing and authorization. See Agreement, at §§ 7.1 – 7.3. The Seller also agreed to various covenants

including, but not limited to, actions before closing, conduct of business, preservation of documents, access to information, and certain employee matters. *See* Agreement, at § 8.1.

       i.      **Conditions.** The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including the truthfulness of all representations and warranties, no material adverse change in the Seller's business, and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained. *See* Agreement, at § 9.1.

       j.      **Retention of Employees.** As a condition to the Closing, the Agreement provides that (i) on or prior to the bid deadline, the Purchaser shall have concluded that it will have the ability to retain those employees listed on Schedule 8.11(a); and (ii) the Purchaser shall have reached an agreement and executed employment agreements with those key employees listed on Schedule 9.1(l).

       k.      **Rule 6004/6006 Waiver.** The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006. *See* Sale Order ¶ 25. As discussed herein, the sale and prompt consummation thereof are in the best interest of the Seller and its estate in order to maintain and otherwise maximize the going concern value of the Seller's assets for the benefit of the estate and its stakeholders and to comply with certain timing deadlines as discussed above.

       l.      **Successor Liability Findings.** The Sale Order provides that the Purchaser and its employees, officers, directors, advisors, lenders, affiliates, owners and successors and assigns shall not have any successor or vicarious liabilities. *See* Sale Order, ¶¶ Y and 11.

       m.      **Record Retention.** While the Seller will provide copies of its books and records to the Purchaser, the Seller will have access to the books and records to enable it to administer its chapter 11 case. *See* Agreement, at § 13.16.

     22.     The Seller believes that the sale of the Acquired Assets as a going concern to the Successful Bidder is in the best interests of the Seller's estate and its creditors. The Seller further believes that obtaining the Purchaser, marketing the Acquired Assets with the assistance of Wedbush, and holding the Auction on the date specified by the Court, will result in the highest or otherwise best consideration for the Acquired Assets and will provide for either the payment or assumption of all known claims against the Seller.

23.     The Seller has examined the alternatives to a sale of the Acquired Assets and has determined that, in light of the Seller's financial situation, liquidity needs, and value of the Acquired Assets, a more viable alternative to sale of the Assets does not exist. The Seller determined that the sale of the Acquired Assets optimizes value for the estate and its creditors which include the assumption of approximately $585,000 in Assumed Liabilities, which is believed to provide for payment or assumption of 100% of the known trade claims against the Seller.

24.     For the reasons stated above, and in light of the obvious benefits to the estate, the Seller has determined, in the exercise of its business judgment, to consummate the proposal submitted under the Agreement with the Purchaser or, if applicable, another bidder in the event that the Seller receives a higher or otherwise better bid to the transaction set forth in the Agreement.

### Relief Requested

25.     The Seller is requesting that this Court, *inter alia*, (a) authorize the sale of the Acquired Assets to the Purchaser pursuant to the Agreement, or alternatively, to the other Successful Bidder pursuant to such competing agreement(s) with such other Successful Bidder entered into in accordance with the Bidding Procedures Order, (b) authorize such sale of the Acquired Assets to be free and clear of all liens, claims, rights, encumbrances or other interests pursuant to sections 105, 363(b), 363(f) and 363(m) and 365 of the Bankruptcy Code, with such liens, claims, rights, encumbrances and interests (collectively, the "Liens, Claims and Encumbrances") attaching to the sale proceeds of the Assets (the "Sale Proceeds") with the same

13

validity (or invalidity), priority and perfection as existed immediately prior to such sale; and

(c) grant such other relief as may be necessary or appropriate.

### Basis for Relief

26.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice

and a hearing, may use, sell or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) provides in relevant part that "[t]he Court

may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a).

27.    A sale of the debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code if a sound business purpose exists for doing so.  *See, e.g., Meyers v. Martin (In*

*re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re*

*Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788

F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In*

*re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396

(W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991).

The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include:  the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the

amount of proceeds to be obtained from the sale versus appraised
values of the Property; and whether the asset is decreasing or
increasing in value. 124 B.R. at 176.

28.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is

proceeding in good faith." *Id.*

29.     The Seller has proposed the sale of the Acquired Assets after thorough

consideration of all viable alternatives and has concluded that the sale is supported by many

sound business reasons.  The Seller has extensively marketed the Acquired Assets as described

above and has proposed Bidding Procedures designed to maximize the purchase price realized

from the sale of the Acquired Assets.

30.     Given the Seller's precarious financial conditions, the lack of adequate working

capital, the Seller's need for an expedited sale process is also necessary to preserve the business

as a going concern.  As set forth in the Agreement, the Seller is required to obtain an order

approving the Bidding Procedures no later than November 6, 2014 and conduct an auction on or

before December 3, 2014.  The Seller believes that (i) all known trade claims against it will

either be paid or have their claims assumed under the Agreement, and (ii) the prepetition and

postpetition marketing of the Seller up to the proposed deadline to submit competing bids for the

Acquired Assets, will provide a sufficient opportunity to generate any potential overbids.  In

addition, the proposed Sale will allow the Seller to emerge as a viable going concern post-Sale,

however, in light of the liquidity issues facing the Seller, it is necessary to move as quickly as possible to consummate the Sale.

31.     The Seller has articulated sound business reasons, set forth above, for a sale of the Acquired Assets on the proposed schedule.  *See, e.g.*, *In re Tempo Tech.*, 202 B.R. 363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) five weeks after the petition date where the debtor was suffering operating losses).

32.     The Seller believes that, as a result of the marketing efforts that have been undertaken and that it will continue to undertake, the highest or otherwise best offer obtained through the proposed Bidding Procedures and Auction will provide maximum value to the Seller under the current circumstances.  Other potential buyers and parties that have expressed interest in the acquisition of the Acquired Assets, will be served with this Sale Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by the Successful

16

Bidder is demonstrated by the marketing efforts that the Seller has undertaken, and will continue

to undertake, followed by a fair and reasonable sale process including a potential auction, and

culminating in the sale of the Acquired Assets.  As noted herein, notice of this Sale Motion, as

well as of the Bidding Procedures Motion, will be served by the Seller on or shortly after the

Petition Date on potential bidders, as well as known putative lienholders,

  33. The sale of the Acquired Assets is supported by sound business reasons and is in

the best interests of the Seller and its estate.  Accordingly, the Seller requests approval under

Bankruptcy Code section 363(b) of the Sale to the Purchaser or other Successful Bidder, as set

forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the
Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

  34. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section
> free and clear of any interest in such Property of an entity other than the
> estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold
> is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to
> accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

  35. Section 363(f) of the Bankruptcy Code provides for the sale of assets "free

clear of any interests."  The term "any interest," as used in section 363(f), is not defined

17

anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209

F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope

of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts

have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in

modern cases is toward "a broader interpretation which includes other obligations that may flow

from ownership of the Property." *Id. at 258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As

determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th

Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the

scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger

Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor

liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

36.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the sale of the Acquired Assets free and

clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any Liens,

Claims and Encumbrances permitted under the Agreement. *See Citicorp Homeowners Services,

Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Seller submits that each Lien, Claim and

Encumbrance that is not an assumed liability satisfies at least one of the five conditions of

section 363(f) of the Bankruptcy Code, and that any such Lien, Claim or Encumbrance will be

adequately protected by either being paid in full at the time of closing, or by having it attach to

the Sale Proceeds, subject to any claims and defenses the Seller may possess with respect

thereto. The Seller accordingly requests authority to convey the Acquired Assets to the

18

Purchaser or other Successful Bidder(s), free and clear of all Liens, Claims and Encumbrances except for the Liens, Claims and Encumbrances that expressly permitted under the terms of the Agreement, with such Liens, Claims and Encumbrances to attach to the Sale Proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the Sale Order.

37.    The Seller has conducted a UCC search and other lien searches of purported lienholders in conjunction with the proposed sale of the Acquired Assets.  The Seller has served such purported lienholders with notice of this Sale Motion, and will serve notice of the Sale Order if and when such order is entered by the Court other than the Purchaser's acquisition of the Senior Secured Indebtedness, there were no other known secured creditors of the Seller and the Purchaser has consented to the Sale.  Out of an abundance of caution, to the extent there are any remaining other secured creditors, (a) applicable non bankruptcy law permits sale of the Acquired Assets free and clear of such creditors' claims, or (b) such creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their claims.

38.    Accordingly, this Court should approve the sale of the Acquired Assets to the Successful Bidder free and clear of Liens, Claims and Encumbrances under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

39.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale. *See* 11 U.S.C. § 363(n). Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

40.    The Agreement is a negotiated, arms' length transaction, in which the Purchaser

has acted in good faith, without collusion or fraud of any kind, and in compliance with the

*Abbotts Dairies* standards.  Neither the Seller nor the Purchaser (to the best of the Debtors'

knowledge) has engaged in any conduct that would prevent the application of section 363(m) of

the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect

to the consummation of the Sale or the transfer of the Acquired Assets to the Purchaser.  In

addition, if a party other than the Purchaser is the Successful Bidder, the Seller intends to make

an appropriate showing at the Sale Hearing that the purchase agreement with the other

Successful Bidder is a negotiated, arms' length transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

41.    The Seller thus requests that the Court find that the Purchaser or the Successful Bidder has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assigned Contracts

42.    As required by the Agreement, and in order to enhance the value to the Seller's estate, the Seller requests approval of the potential assumption and assignment of the Assigned Contracts to Purchaser or the other Successful Bidder upon the closing of the transactions contemplated under the Agreement.

43.    Pursuant to the Agreement, the Purchaser (or Successful Bidder) is responsible for payment of all cure amounts required to be paid to the counterparties to the Assigned Contracts assumed and assigned (each a "Counterparty" and collectively, the "Counterparties") under section 365(b)(1) of the Bankruptcy Code.  The Agreement further provides that the Purchaser may elect to delete or add agreements to list of Assigned Contracts at any time up to and prior to the bid deadline.

44.    The Assigned Contracts are those contracts or leases that are to be assumed by the Seller and assigned to the Purchaser or the other Successful Bidder as part of the sale transaction under the Agreement.  The Seller further requests that the Sale Order provide that the Assigned Contracts will be assigned to, and remain in full force and effect for the benefit of, the Purchaser

or the other Successful Bidder, notwithstanding any provisions in the Assigned Contracts,

including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that

prohibit such assignment.

45.    Pursuant to the Sale Procedures Motion, the Seller propose that an initial list (or

lists) of Assigned Contracts be served on all counterparties to such contracts and leases no later

than two (2) business days after the Bid Procedures Hearing.

46.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

DOCS_LA:281864.11 87714/001

>    (C) provides adequate assurance of future performance under such
>    contract or lease.

11 U.S.C. § 365(b)(1).

47.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The potential assumption and assignment of the Assigned Contracts, or any of them, set forth in the Agreement, will be a necessary part of the deal that Seller has struck with the Successful Bidder and, as stated above, will benefit the estate of Seller.

48.    As set forth above with respect to Assigned Contracts to be potentially assumed and assigned pursuant to the Sale Hearing, the Seller has or will send the Cure Notices to all Counterparties concurrently with the filing of this Sale Motion, thereby notifying such Counterparties of the potential assumption by the Seller and assignment to the Purchaser or the Successful Bidder of the Assigned Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts owing on each of the Assigned Contracts, according to Seller's books and records and, in accordance with the provisions set forth in the Bid Procedures, shall be  the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure

23

Amounts"). The Sale Procedures Motion proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of their Assigned Contracts to Purchaser or adequate assurance of future performance be filed on or before November 25, 2014 (i.e., the objection deadline to the proposed sale). Objections to the adequate assurance of future performance of a Successful Bidder (other than the Purchaser), may be raised at the Sale Hearing.

49.     Counterparties to the Assigned Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease Counterparty. The payment of the Cure Amounts specified in the Cure Notices (or a different amount either agreed to by the Purchaser, or the Successful Bidder, or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Seller determines (with the consent of the Purchaser or Successful Bidder) that a particular lease or contract is not truly executory, and does not need to be cured to transfer the lease or contract to the Successful Bidder or Purchaser.

50.     Cure Amounts disputed by any Counterparty will either be considered by the Court either at the Sale Hearing or at some later date as may be scheduled by the Court to determine contested objections regarding Cure Amounts, that have not been resolved in advance or at the Sale Hearing. With respect to payment of Cure Amounts, the Purchaser or Successful Bidder shall bear and pay the entire amount of such cure costs.

51.     The Purchaser or Successful Bidder is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contract.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the Purchaser or the other Successful Bidder shall provide evidence of its ability to provide adequate assurances to Counterparties to the Assigned Contracts at the Sale Hearing.  Moreover, any Successful Bidder will be required to provide evidence that the bidder can provide adequate assurance of future performance with respect to the Assigned Contracts at the time it submits its bid.

### Notice

52.     Notice of this Motion and a copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) the thirty largest unsecured creditors of the Debtors on a consolidated basis; (c) all parties who are known by the Seller to assert liens with respect to the Acquired Assets, if any; (d) all entities who executed non-disclosure agreements with the Seller in connection with a potential acquisition of any or all of the Acquired Assets or whom the Seller

DOCS_LA:281864.11 87714/001

believes may have an interest in bidding; (e) all counterparties to the Assigned Contracts; (f) the Purchaser and its counsel; and (g) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure. Upon approval of the Bidding Procedures Motion, the Seller will serve notice of this Sale Motion (as proposed in the Bidding Procedures Motion, subject to Court approval) on all other known creditors of the Seller, and serve supplemental notice including of applicable deadlines and hearing dates to the parties previously served with notice of the Sale Motion (as proposed in the Bidding Procedures Motion, subject to Court approval). The Seller respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

53.     The Seller requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

## Conclusion

54.     The Seller's proposed sale of the Acquired Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Seller, its estate and creditors and all parties in interest. The Seller thus requests that the Court approve the proposed Sale of the Acquired Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to the Purchaser or other Successful Bidder.

## No Prior Request

55.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.

WHEREFORE, the Seller respectfully requests that this Court (i) grant this Sale Motion and authorize the sale of the Acquired Assets to the Purchaser or other Successful Bidder and approve the Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments of the Assigned Contracts; and (iii) grant such other and further relief as is just and proper.

Dated: October 20, 2014                    PACHULSKI STANG ZIEHL & JONES LLP

                                           _James E. O'Neill_ (signature)

                                           Jeffrey N. Pomerantz (CA Bar No. 143717)
                                           Debra I. Grassgreen (CA Bar No. 169978)
                                           James E. O'Neill (Bar No. 4042)
                                           Joshua M. Fried (CA Bar No. 181541)
                                           919 North Market Street, 17th Floor
                                           P.O. Box 8705
                                           Wilmington, DE 19899-8705 (Courier 19801)
                                           Telephone: (302) 652-4100
                                           Facsimile:  (302) 652-4400
                                           E-mail:        jpomerantz@pszjlaw.com
                                                          joneill@pszjlaw.com
                                                          jfried@pszjlaw.com


                                           [Proposed] Counsel to Debtors and
                                           Debtors in Possession