IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ULTURA (LA) INC., et al.,[1] | ) | Case No. 14-12382 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**Hearing Date: TBD**
**Objection Deadline: TBD**

### ULTURA (OCEANSIDE) INC.'S MOTION FOR ORDER: (A) APPROVING BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF ULTURA (OCEANSIDE) INC. OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) APPROVING PAYMENT OF A BREAK-UP FEE; AND (D) GRANTING RELATED RELIEF

Ultura (Oceanside) Inc., one of the above-captioned debtors and debtor in possession herein ("Oceanside" or the "Seller"), files this motion (this "Bidding Procedures Motion") for entry of an order:  (a) approving bid procedures break-up fee in connection with the sale of substantially all assets of Oceanside; (b) scheduling an auction and hearing to consider the sale of the assets including the potential assumption and assignment of designated contracts and approve the form and manner of notices related thereto; and (c)  granting related relief.

Concurrently herewith, the Seller is filing the *Ultura (Oceanside) Inc.'s Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All Assets of Ultura (Oceanside) Inc., Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); (C) Assuming and Assigning*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are:  Ultura (LA) Inc. (9624) and Ultura (Oceanside) Inc. (6429).  The mailing address for each of the Debtors is:  3605 Long Beach Blvd., Suite 201, Long Beach, CA 90807.

*Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* (the "Sale Motion"), which seeks authorization of the sale of substantially all of the assets of Oceanside to (i) UAC Finance, Inc. (the "Stalking Horse Bidder" or the "Purchaser") pursuant to that certain agreement between the Seller and the Stalking Horse Bidder dated as of October 20, 2014 a copy of which agreement, is attached to the Sale Motion as Exhibit A (the "Agreement"),[2] or alternatively, (ii) the highest or otherwise best bidder for such assets determined in accordance with the proposed bid procedures. As discussed below and in the Sale Motion, the sale process is in the best interests of the Seller its estate and creditors, and is necessary to meet the deadlines established in the Agreement.

In support of this Bidding Procedures Motion, the Seller respectfully states as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

---

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

**Background**

4.      On October 20, 2014, the Seller and its affiliate, Ultura (LA) Inc. ("LA") each

commenced their respective cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  The Debtors have continued in the possession of their property and have

continued to operate and manage their businesses as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

5.      The factual background relating to the commencement of the Debtors' chapter 11

cases (the "Chapter 11 Cases") is set forth in detail in the *Declaration of Grant Lyon in Support*

*of First Day Motions* and incorporated herein by reference.

**Oceanside Operations and the Assets to Be Sold**

6.      Pursuant to the Sale Motion, the Seller seeks approval of the sale (the "Sale") of

substantially all of its assets necessary to the operation of its business, including, *inter alia*,

unexpired leases and executory contracts, personal property, intellectual property, intangible

property, inventory, vendor items, and certain claims and liabilities to be assumed by the

Stalking Horse Bidder, all as more fully set forth in the Agreement (collectively, the "Acquired

Assets").  The total consideration to be paid by Purchaser to Seller for the Acquired Assets shall

be $25,000,000 (the "Purchase Price"), which bid is comprised of (i) a credit bid amount equal to

all outstanding obligations owed by Seller to Purchaser under the DIP Loan (defined below); (ii)

a credit bid of a portion of the obligations owing under the Senior Secured Loan (defined below)

and (iii) and the assumption of up to $585,000 of Assumed Liabilities under the Agreement.

7.    In light of (i) the extensive marketing process already undertaken; (ii) the additional efforts that will be made postpetition during the proposed sale process; and (iii) the current liquidity issues facing the Seller, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse Bidder under the terms of the Agreement or, alternatively, to a higher and better bidder for the Acquired Assets. Pursuant to the Agreement, the Seller must obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") no later than November 7, 2014 establishing a bid deadline of no later than November 25, 2014, conduct an auction, no later than December 3, 2014, obtain an order approving the Sale no later than December 5, 2014 and close such Sale no later than December 12, 2014 (to the extent Purchaser waives the requirement that the Sale Order becomes a final order; however, if Purchaser does not waive such requirement, then such date shall be December 23, 2014). In light of the prepetition marketing efforts and based upon the precipitous financial condition of the business, the Seller believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.

**Marketing Process**

8.    As part of the Seller's restructuring efforts, the Seller determined to undergo a sale process for all or a part of its business lines. Significant efforts were undertaken by both the Seller and Wedbush Securities Inc. to market the Acquired Assets. The potential sale was featured in an article in Global Water Intelligence ("GWI"), an industry publication, on July 14, 2014.

9.      On July 1, 2014, the Seller also engaged Wedbush Securities, Inc. ("Wedbush") to sell, among other assets the Membrane Business.  Wedbush prepared marketing materials, including an executive summary ("Teaser") and a management presentation, and an online data site with diligence materials.  Wedbush distributed approximately 175 Teasers to industry participants, strategic and financial investors, and other potential buyers.  Approximately 60 parties returned executed confidentiality agreements and were provided with access to the online data site.

10.      On August 7, 2014, Purchaser acquired the Sellers' outstanding secured indebtedness, and subsequently submitted the only bid for Ultura Oceanside's assets-- the Membrane Business.  Oceanside began an extensive negotiation with the Purchaser relating to the potential sale and beginning in late September, 2014, Wedbush also re-approached 19 of the potential strategic buyers that had indicated the most interest for a stand-alone Membrane Business.  No party submitted an offer for the Membrane Business at the time the negotiations were occurring with Purchaser.

11.      Ultimately, after extensive negotiations, Oceanside and the Purchaser entered into the Agreement, which is attached to the Sale Motion as **Exhibit A** thereto.  As noted above, the consideration for the purchase of the Acquired Assets under the Agreement is (i) the assumption or payment of all known trade claims against the Seller up to a cap of $585,000 (which is estimated to equal 100% of trade claims); and (ii) Purchaser's credit bid against the DIP Loan and a portion of the Prepetition Loan as described below.

12.     The Seller believes that (i) based on the fact that all known trade claims against it, up to the cap, will either be paid or assumed under the Agreement and (ii) the prepetition and postpetition marketing of the Seller up to the proposed deadline to submit competing bids for the Acquired Assets, will provide a sufficient opportunity to generate any potential overbids and is in the best interest of the Seller and its estate.  In addition the Sale of the Seller pursuant to section 363(b)(1) of the Bankruptcy Court preserves the business as a viable going concern post-Sale and otherwise maintains and preserves the jobs of substantially all employees relating to the Seller's business.  As noted below, the Seller is currently dependent on external funding by the Purchaser in order to maintain operations due to a lack of cash liquidity.  The Sale of the Seller will eliminate the need for such piecemeal funding of the Seller's operations, and will allow it to emerge with a much stronger balance sheet and otherwise provide it with sufficient operating capital to maintain its business as a going concern.

*Secured Debt Obligations Owing to Purchaser*

13.     Prior to the Petition Date, the Debtors and certain affiliates entered into a loan (the "Prepetition Loan") with Hercules Technology Growth Capital, Inc. ("Hercules") evidenced by, among other things, the following documents, instruments, and agreements (collectively, the "Prepetition Loan Documents"):  (i) Loan and Security Agreement dated as of September 29, 2013, by and between APTwater, Inc. (n/k/a Ultura Inc.) and Hercules; (ii) Joinder Agreement dated as of September 9, 2013, by and between Rochem Membrane Systems, Inc. (n/k/a LA) and Hercules; (iii) Joinder Agreement dated as of November 15, 2013, by and between Sepro Membranes, Inc. (n/k/a Oceanside) and Hercules; (iv) Amendment to Loan ("First Loan

6

Amendment") dated as of July 4, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Hercules; and (v) Second Amendment to Loan Agreement ("Second Loan Amendment") dated as of August 25, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Purchaser.[3] The Loan and Security Agreement and the Joinder Agreement granted Hercules a security interest against substantially all assets of the Debtors, including but not limited to the Receivables, Equipment, Fixtures, General Intangibles, Inventory, Investment Property of the capital stock of any Foreign Subsidiary that constitutes a Permitted Investment, Deposit Accounts, Cash, Goods (each as defined in the Prepetition Loan Documents), and all other tangible and intangible personal property of the Debtors, including all proceeds of the foregoing. The collateral described in this paragraph is referred to herein as the "Prepetition Collateral."

14.     Pursuant to that certain Loan Sale Agreement dated as of August 7, 2014, by and between Hercules and Purchaser, Hercules transferred to Purchaser all of its right, title, and interest in, to, and under the Prepetition Loan and the Prepetition Loan Documents. Thereafter, as set forth below, Purchaser agreed to continue funding Oceanside's operations pursuant to the terms of the Second Loan Amendment.

---

[3]  In 2011, Ultura, Inc. acquired Rochem AG ("Rochem"). Rochem had over forty years of experience in the leachate and marine solutions business. As part of its efforts to acquire Rochem, Ultura Inc. embarked on an effort to raise capital through the issuance and sale of Series C Preferred Stock. On or about September 8, 2011, Ultura Inc. and True North Ventures, LP ("True North"), a venture capital fund and affiliate of UAC, entered into a stock-purchase agreement pursuant to which True North purchased approximately $23.5 million of Ultura Inc. preferred stock and took a seat on Ultura Inc.'s board of directors which was subsequently relinquished. The amount owing to True North in connection with its investment with Ultura, Inc. to finance the Rochem acquisition was eventually converted into secured indebtedness (the "Exchange Notes") against Ultura, Inc. to resolve litigation between Ultura Inc. and True North. The Exchange Notes held by True North are not asserted against the Debtors.

15.    Purchaser advised the Debtors that, based upon various defaults, the financial instability of the business, and the ongoing need for funding, Purchaser was unwilling to advance additional funds unless certain changes were made to the management of the business.  Pursuant to the Second Loan Amendment, Purchaser agreed to continue funding the Debtors' operations upon the creation of a three-member restructuring committee (the "Restructuring Committee") with broad authority to direct matters relating to the restructuring of Oceanside.  Purchaser identified Grant Lyon and Michael Carmel as two potential members of the Restructuring Committee, which were acceptable to Ultura Inc. and Oceanside.  The third member of the Restructuring Committee is Randall Blank, who has been serving as a director of Oceanside's ultimate parent, Ultura Inc.  Grant Lyon is also the President and Chief Executive Officer of LA and the President of Oceanside.[4]

16.    The Purchaser is also the proposed postpetition lender pursuant to the *Motion of Debtor Ultura (Oceanside) Inc. for Interim and Final Interim Orders under 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtor To (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing* (the "DIP Motion"), filed concurrently herewith.  The DIP Motion seeks, *inter alia*, of approximately $2,262,077 postpetition financing in order to fund the Debtors' Chapter 11 Cases.  Oceanside is in need of this postpetition financing and continues to operate with a very thin working capital

---

[4]  The Restructuring Committee was also created at Ultura Inc.

reserve, especially with the increased restructuring costs associated with the chapter 11 case.  It is in the best interest of the company and its stakeholders to expedite the sales process in this case.  Because of liquidity constraints, the Seller has not been able to inject much needed capital to grow the business.  As a result the Seller has been susceptible to competitive pressures which has affected its operating performance.

17.    While the prepetition marketing and sale process was thorough, as discussed above, the Seller will send, or will have sent, notice of the Sale Motion and Bidding Procedures to all parties that the Seller believes may be potentially interested in acquiring the Acquired Assets.  The Seller will also maintain its electronic data room with key documents and company-specific information in order to streamline the due diligence process going forward.  The data room has been, and will be, available to interested parties who have, or will, execute confidentiality agreements acceptable to the Seller.  The Seller will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Acquired Assets and will continue to engage Wedbush as its investment banker.

18.    In light of the prepetition marketing efforts, the Seller believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.  Further, given the current financial position of the Seller, it is necessary to consummate a sale as quickly as possible.  The Seller believes that the consummation of the Sale to the Purchaser or other Successful Bidder will

9

provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Acquired Assets.

### Relief Requested

19.    Pursuant to this Bidding Procedures Motion, the Seller requests that the Court, among other things:

        (a)    approve the Purchaser's status as the Stalking Horse Bidder;

        (b)    approve the proposed bidding procedures (the "Bidding Procedures"), including the break-up fee, attached hereto as **Exhibit A**;

        (c)    approve, pursuant to the terms of the Agreement, the requested break-up fee in the amount of $750,000 (or approximately 3% of the $25,000,000 Purchase Price) (the "Break-Up Fee"), which Break-Up Fee will a have superpriority administrative claim status in the Seller's case pursuant to Bankruptcy Code section 507(b), senior to all administrative expense priority claims (subject in all respects to the terms and provisions of the DIP Order).  Provided that Purchaser is not otherwise in breach of the Agreement, the Breakup Fee would be fully paid to the Purchaser under the following events:  (i) upon consummation of an Alternative Transaction; or (ii) in the event of a material breach of any covenant or condition of Seller or any material breach of a representation or warranty of Seller; which Break-up Fee would be paid from the sale proceeds of the Alternative Transaction under either event.

        (d)    establish a date for potentially holding an auction (the "Auction") and approve certain procedures in connection therewith;

(e)     schedule the hearing to approve any sale transaction to the Purchaser or to such other party that makes the highest or otherwise best offer for the assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in the Sale Motion; and

(f)     approve the form and manner of notice to be served upon certain parties, including: (i) the form of notice, substantially in the form attached hereto as **Exhibit B**, to be served on the Sale and Bid Procedures Notice Parties (defined below); (ii) the form of notice, substantially in the form attached hereto as **Exhibit C**, to be served on all known creditors of the Seller (the "Creditor Notice"); and (iii) the form notice for parties holding executory contracts or unexpired leases with the Seller that are likely to be assumed and assigned in conjunction with the proposed sale of the Acquired Assets, in substantially the form attached hereto as **Exhibit D** (the "Cure Notice").

**Sale Hearing**

20.    The Seller requests that the Court schedule a Sale Hearing no later than December 4, 2014 in order to allow timely entry of the Sale Order by December 5, 2014 and for completion of the closing transactions set forth in the Agreement by December 12, 2014 (to the extent Purchaser waives the requirement that the Sale order becomes a final order; however, if Purchaser does not waive such requirement, then such date shall be December 23, 2014). Further, the Seller requests that objections, if any, to the Sale Motion be filed no later than 4:00 p.m. prevailing Eastern Time on November 25, 2014.

11

### Proposed Bidding Procedures

21.     The Bidding Procedures are attached hereto as <u>Exhibit A</u>.  The Bidding

Procedures are summarized as follows:[5]

(a)     <u>Assets to be Sold</u>:  The Seller is offering for sale substantially all

of its assets necessary to operate its business, excluding the Excluded Assets, as defined in the

Agreement.

(b)     <u>Participation Requirements</u>.  Any person that may be interested in

the Acquired Assets (a "<u>Potential Bidder</u>") must deliver to the Seller, at the addresses specified

below (unless a particular document has been previously delivered), not later than five (5)

business days before the Bid Deadline (defined below):

i.      An executed confidentiality agreement ("<u>Confidentiality Agreement</u>") in form and
        substance acceptable to the Seller;

ii.     identification of the Potential Bidder, its principals, and the representatives
        thereof who are authorized to appear and act on its behalf for all purposes
        regarding the contemplated transaction;

iii.    written disclosure of any connections or agreements with the Seller, the
        Purchaser, any other known Potential Bidder or Qualified Bidder (defined below),
        and/or any officer, director, manager or direct or indirect equity security holder of
        the Seller;

iv.     a letter of indication stating that such bidder is prepared to enter into a legally
        binding purchase agreement or similar agreement for the acquisition of the
        Acquired Assets on or prior to the date of the Bid Deadline on terms and
        conditions no less favorable in the aggregate to the Seller than the terms and
        conditions contained in the Agreement, indicating (a) that such bidder will post
        the required Bid Deposit (defined below); (b) total cash consideration expected to
        be provided to the Seller at Closing is at least equal to $25,415,000 <u>plus</u>
        assumption of up to $585,000 in Assumed Liabilities as provided in the

---

[5]  Nothing in this summary shall be construed in any way to limit or alter any of the provisions of the Bidding
Procedures, or to guide in the interpretation of the Bidding Procedures in any other proceeding.  This summary is
provided merely as a convenience to the Court and parties in interest evaluating the Bidding Procedures.

Agreement; and (c) the closing of the transaction will occur no later than December 12, 2014;[6] and

v.     sufficient information, as may be requested by the Seller in its discretion, to allow the Seller to determine that the Potential Bidder has the operational and financial capability to close a sale of the Acquired Assets (which may include, but is not limited to, a bank account statement showing the ability of a Potential Bidder to pay cash for the Acquired Assets, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Seller) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder, proof of any debt or equity funding commitments that are needed to close the contemplated transaction, and/or operational information).

As provided below, only Potential Bidders who satisfy the foregoing requirements may participate in the due diligence process.

A "Qualified Bidder" is a Potential Bidder that delivers the documents and information described in subparagraphs (i) – (v) above and who satisfies the following additional requirement, as to be determined by the Seller in its discretion:

- The Seller has determined the Potential Bidder is reasonably likely (based on, among other things, operational and financial information submitted by the Potential Bidder, the Potential Bidder's operational and financial capability to close a sale of the Acquired Assets, experience, and other non-monetary considerations, such as ability to obtain any required regulatory approvals, to submit a bona fide offer, and be able to consummate a sale if selected as the Successful Bidder (as defined below).

As set forth further below, only a Qualified Bidder may submit a Qualified Bid, and the Qualified Bidder's bid must meet certain requirements as described below to constitute a Qualified Bid. So long as it is not in breach of the Agreement, the Purchaser shall be deemed a Qualified Bidder.

---

[6] Under the Agreement, the Purchaser has the right, in its sole discretion; to extend the deadline through December 23, 2014 to the extent it requires the sale order to become final.

Not later than three (3) business days after a Potential Bidder delivers all of the materials and information that may be required by the Seller in preceding subparagraphs (i) through (v) above, the Seller shall determine, and shall notify the Potential Bidder upon such determination, if such Potential Bidder is a Qualified Bidder.

        (c)    <u>Due Diligence</u>:  Only Qualified Bidders are eligible to receive due diligence access and/or certain non-public information.  If the Seller determines that a Potential Bidder no longer constitutes a Qualified Bidder, then such Potential Bidder's access to due diligence or other non-public information shall terminate.  The Seller is not responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders or Qualified Bidders in connection with the sale of the Acquired Assets.

Notwithstanding the foregoing, neither the Seller nor its representatives shall be obligated to furnish information of any kind to any person that the Seller determines not to be a Qualified Bidder.  The Seller will afford any Qualified Bidder the time and opportunity to conduct reasonable due diligence; <u>provided</u>, <u>however</u>, that the Seller shall not be obligated to furnish any due diligence information after the Bid Deadline.  The Seller will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.

        (d)    <u>Bid Requirements</u>:  All bids, other than the Agreement, shall be made by Qualified Bidders in writing and must include the following terms, conditions, information and documents (the "<u>Required Bid Materials</u>"):

i.       A Qualified Bid must have similar or better terms and conditions as the
         Agreement (as determined by the Seller in its business judgment), with higher
         consideration by having an aggregate value of not less than the sum of (i)
         $25,000,000 (which amount includes the assumption of up to $585,000 of
         Assumed Liabilities under the Agreement), plus (ii) $750,000 in cash (which
         amount is the Break-Up Fee (defined below); plus (iii) an initial bid increment of
         $250,000 in cash.  Additional bid increments shall be in the amount of $100,000,
         provided, however, that each Qualified Bid must provide for the payment of the
         Break-Up Fee in cash upon the closing of the applicable transaction
         (the "Minimum Bid Amount").  A Qualified Bid should propose a contemplated
         transaction involving all or substantially of the Acquired Assets.

ii.      A letter stating and agreeing that the Qualified Bidder's offer is irrevocable until
         the earlier of (i) the second business day after the Acquired Assets on which the
         Qualified Bidder is submitting a bid have been sold pursuant to the closing of the
         sale or sales or (ii) up to and including the close of business on the date that is
         three (3) Business Days after the date on which the Agreement terminates, and
         that such offer will serve as a Backup Bid (as defined below) if so selected by the
         Seller.

iii.     An executed copy of an asset purchase agreement and a redline of a Qualified
         Bidder's proposed asset purchase agreement reflecting variations from the
         Agreement (the "Marked Agreement").  All Qualified Bids must provide (a) a
         commitment to close within the same (or shorter) time period set forth in the
         Agreement; (b) a representation that the Qualified Bidder will, if applicable,
         (1) make all necessary filings under any applicable regulatory filing, and pay the
         fees associated with such filings and (2) submit all necessary regulatory filings
         within the same (or shorter) time period, if any, set forth in the Agreement.

iv.      A cash deposit in the amount of ten percent (10%) of the Qualified Bid, in the
         form of a wire transfer, certified check or such other form acceptable to the Seller
         (the "Bid Deposit"), which shall be placed in an escrow account or other
         segregated account acceptable to the Seller (the "Escrow Account").

v.       A representation of the Qualified Bidder and written evidence acceptable to the
         Seller in its reasonable discretion that the bidder has the financial wherewithal to
         consummate the proposed transaction, provided that if a bid is based partly or
         completely on financing (provided such financing shall not be a condition to
         closing), written evidence of the commitment for financing and the appropriate
         contact information for such financing source must be provided.

vi.      The Qualified Bid shall not request or entitle the bidder to any transaction or
         break-up fee, expense reimbursement, termination or similar type of fee or
         payment, and shall include an acknowledgement and representation of the
         Qualified Bidder that it has had an opportunity to conduct any and all due

diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Marked Agreement.

vii.     The Qualified Bid shall not contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under any regulatory agency (if applicable) shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

viii.    The Qualified Bid shall fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

ix.      The Qualified Bid shall state that the offering party consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the Qualified Bidder's contemplated transaction documents.

x.       The Qualified Bid shall provide that the Qualified Bidder shall be bound as a "Backup Bidder" as provided below.

xi.      The Qualified Bid shall include evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials to the satisfaction of the Seller in its reasonable discretion, and is received by the Bid Deadline is a "Qualified Bid." The Seller reserves the right to determine the value of any Qualified Bid, and which Qualified Bid constitutes the highest or best offer (subject to Bankruptcy Court approval). The Seller shall notify the Purchaser within twelve (12) hours of receipt of any bids, the identity of the bidders, shall provide the Purchaser with a copy of any Marked Agreement and indicate whether such bid constitutes a Qualified Bid.

(e)     Bid Deadline: The deadline for submitting Qualified Bids by a

Qualified Bidder shall be November 25, 2014 at 4:00 p.m. (prevailing Eastern Time) (the "Bid

Deadline").

(f)    <u>Auction</u>: If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Seller by the Bid Deadline, the Seller may conduct an auction (the "<u>Auction</u>") of the Assets.  The Seller shall provide Qualified Bidders that submitted Qualified Bids with a copy of the purchase agreement(s) relating to the other Qualified Bids at least twenty-four (24) hours prior to the Auction.  The Auction shall be conducted at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, Delaware 19899 at 10:00 a.m. (prevailing Eastern Time) on December 3, 2014.  The Auction will be governed by various procedures, as set forth in the attached Bidding Procedures.

(g)    <u>Acceptance of Qualified Bids</u>: The Seller shall sell the Acquired Assets to any Successful Bidder (or the party who submitted the Backup Bid ("<u>Backup Bidder</u>") should such Qualified Bidder's become the Successful Bidder as described further in the Bidding Procedures) only upon the approval of such Qualified Bidder's Qualified Bid by the Bankruptcy Court after the Sale Hearing.  The Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Seller's acceptance of the bid.  The Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

(h)    <u>Return of Bid Deposits</u>: The Bid Deposits shall not be subject to the claims, liens, security interests, or encumbrances of Seller's creditors.  The Bid Deposits of Qualified Bidders shall be disbursed from the Escrow Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid Deposit will be released to the Seller or

17

applied as provided under any asset purchase agreement between the Seller and such Successful Bidder, and (ii) if such Qualified Bidder is not the Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below.  Other than the Bid Deposits of the Successful Bidder and the Backup Bidder, Bid Deposits of all other Qualified Bidders shall be returned as soon as practicable after entry of the order approving the sale of the Acquired Assets.  In addition to any other remedies available to the Seller, the Seller may retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its obligations pursuant to these Bidding Procedures or its Qualified Bid.

### Notice of Sale Hearing

22.     As noted above, given the current financial condition of Oceanside, its limited liquidity, and based on the Agreement's requirement that an Auction occur no later than December 3, 2014 and a sale order be entered no later than December 5, 2014, the Seller requests that the Court schedule the Sale Hearing no later than December 4, 2014.  The Seller proposes that objections, if any, to the Sale Motion be filed on or before 4:00 p.m. on November 25, 2014 (prevailing Eastern Time).

23.     The Seller requests that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit B (the "Sale and Bid Procedures Notice"), which the Seller will serve on the following parties:

(a)     the U.S. Trustee;

(b)     any official appointed committee of unsecured creditors (if any);

18

(c)     the thirty largest unsecured creditors of the Debtors on a consolidated basis;

(d)     all parties known by the Seller to assert a lien on any of the Acquired Assets, if any;

(e)     all entities who executed NDAs with the Seller in connection with a potential acquisition of any or all of the Acquisition Assets or whom the Seller believes may have an interest in bidding;

(f)     all counterparts to executory contracts and leases with the Seller;

(g)     the Purchaser and its counsel; and

(h)     all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the date of entry of the Bidding Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

24.     Additionally, the Seller proposes to serve the Creditor Notice substantially in the form attached hereto as Exhibit C on all known creditors of the Seller.

25.     The Seller proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 10100 Santa

Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: Jeffrey N. Pomerantz and Joshua

M. Fried or by email to jpomerantz@pszjlaw.com and jfried@pszjlaw.com.

### Sale Hearing

26.     At the Sale Hearing, the Seller will seek Bankruptcy Court approval of the sale of

the Acquired Assets to the Successful Bidder, free and clear of all liens, claims and

encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and

interests permitted under the Agreement) with all such liens, claims and interests to attach to the

proceeds of the Sale of the Acquired Assets, except as otherwise provided with the same validity

and in the same order of priority as they attached to the Acquired Assets prior to the Sale.

### Closing

27.     The closing shall take place in accordance with terms of the Agreement, or in

accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale

Hearing.

### Procedures for the Assumption and Assignment of Assigned Contracts

28.     As set forth in the Agreement and the Sale Motion, the Purchaser has designated

certain executory contracts and unexpired leases for assumption and assignment to it (the

"Assigned Contracts").  The Purchaser may add or delete the list of Assigned Contracts for

assumption and assignment up until the Bid Deadline.  The Seller will serve the Auction and the

Sale Hearing Notice and the proposed cure notice (the "Cure Notice") in substantially the form

of Exhibit D hereto upon each counterparty to such Assigned Contracts (collectively, the

20

"Counterparties") with the Seller that may be assumed by the Seller and assigned to the Purchaser as part of the Sale. The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of the Assigned Contracts must be filed and served. The Cure Notice also will identify the Cure Amounts, if any, that the Seller believes are owed to each Counterparty to a Assigned Contract in order to cure any defaults that exist under such Assigned Contract. If a contract or lease is assumed and assigned pursuant to this Court's order approving same, then unless the Assigned Contract Counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Assigned Contract Counterparty will receive at the time of the Closing (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement or the agreement of the Successful Bidder. If an objection is filed by a Counterparty to an Assigned Contract, the Seller proposes that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount (if any) specified by the Seller in the Cure Notice. As noted above, the Purchaser may elect to add or delete agreements from the list Assigned Contracts at any time prior to the Bid Deadline. The non-debtor party or parties to any such deleted Assigned Contract will be notified of such deletion by written notice mailed within two (2) business days of such determination.

29.    If any Counterparty objects for any reason to the assumption and assignment of the Assigned Contract, the Seller proposes that the Counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time), November 25, 2014, or (ii) the date otherwise

21

specified in the Cure Notice.  Objections to Cure Amounts shall either be considered by the Court either at the Sale Hearing, or at some later hearing date scheduled by the Court for objections to Cure Amounts that have not been resolved at or prior to the Sale Hearing.

30.     The Purchaser or Successful Bidder shall be responsible for payment of all Cure Amounts refuted to be made to be Counterparties pursuant to section 365(b)(1) of the Bankruptcy Code.  The Purchaser or the Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assigned Contract.  Objections to the adequate assurance of future performance of a Successful Bidder may be raised and considered at the Sale Hearing.

31.     Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder, subject to the payment of any Cure Amounts, the assignee of the Assigned Contracts will not be subject to any liability to the assigned contract Counterparty that accrued or arose before the closing date of the sale of the Acquired Assets and the Seller shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

## Approval of Bid Protections Is Appropriate

32.     As indicated above, the Seller hereby requests that the Court approve the Break-up Fee and Bidding Procedures in their entirety, as is customary in similar circumstances.  To compensate the Purchaser whose bid will be subject to higher or better offers, the Seller seeks approval of the Break-Up Fee in accordance with the terms of the Agreement.

33.     The Seller and Purchaser believe that the amount of the Break-Up is reasonable, given the benefits to the Seller's estate of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Purchaser, and the risk to the Purchaser that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee under the terms of the Agreement (including the super-priority administrative claim status thereof) are necessary to preserve and enhance the value of the Seller's estate.  The Seller believes that the agreement to pay the Break-Up Fee on the terms of the Agreement is necessary to induce the Seller to enter into the transactions encompassed by the Agreement and thus to enable the Seller to obtain the highest and best possible price for the Acquired Assets.

(a)     Further, the Seller believes that the Break-Up Fee is fair and reasonable provision under all the circumstances.  The Break-Up Fee is only payable either (i) upon consummation of an Alternative Transaction and from the sale proceeds of such transaction; or (ii) from the sale proceeds of an Alternative Transaction in the event of a material breach of any covenant or condition of Seller or any material breach of a representation or warranty of Seller.

34.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Break-Up Fee and Bidding Procedures will encourage competitive bidding, and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

35.     Bidding incentives encourage a potential purchaser to invest the requisite time,

money and effort to negotiate with the Seller and perform the necessary due diligence attendant

to the acquisition of the Seller's assets, despite the inherent risks and uncertainties of the chapter

11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the

Break-Up Fee, under the "business judgment rule," which proscribes judicial second-guessing of

the actions of a corporation's board of directors taken in good faith and in the exercise of honest

judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (internal

quotation marks and citation omitted).

36.     The Third Circuit has established standards for determining the appropriateness of

bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*,

181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured

against a business judgment standard in nonbankruptcy transactions, the administrative expense

provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be

approved, bidding incentives must provide some benefit to the Seller's estate. *See id.* at 533.

37.     The *O'Brien* court identified at least two instances in which bidding incentives

may provide benefit to an estate.  First, benefit may be found if "assurance of a break-up fee

promoted more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited." *Id.* at 537.  Second, where the

availability of bidding incentives induces a bidder to research the value a debtor's assets and

24

submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

38.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee passes muster.  The Agreement and the Seller's agreement to pay the Break-Up Fee pursuant to the terms thereunder is the product of good faith, arm's-length negotiations between the Seller and the Purchaser.  The Break-Up Fee is fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Purchaser of being used as a stalking horse bidder.  Similarly, the Agreement provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth." *Id.*

39.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee will permit the Seller to insist that competing bids for the Acquired Assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Seller's estate.

40.     Furthermore, the Break-Up Fee, in the amount of $750,000, or 3% of the Purchase Price under the Agreement, is within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See, e.g., In re Global Motorsport Group, Inc., et al.,* (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case

25

No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del.,

July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

## No Prior Request

41.    No prior request for the relief sought in this Bidding Procedures Motion has been made to this or any other court.

**Notice**

42.     Notice of this Motion and a copy of this Motion will be provided to (a) the Office

of the United States Trustee; (b) the thirty largest unsecured creditors of the Debtors on a

consolidated basis; (c) all parties who are known by the Seller to assert liens with respect to the

Acquired Assets, if any; (d) all entities who executed NDAs with the Seller in connection with a

potential acquisition of any or all of the Acquired Assets or whom the Seller believes may have

an interest in bidding; (e) counterparties to executory contracts and leases with the Seller; (f) the

Purchaser and its counsel; and (g) all parties who have timely filed requests for notice under Rule

2002 of the Federal Rules of Bankruptcy Procedure.  Upon approval of this Motion, the Seller

will serve notice of the  Sale Hearing, Bidding Procedures and related matters on all of the

foregoing service parties and all other creditors of the Seller known by it (as proposed herein,

subject to Court approval).  The Seller respectfully submits that such notice is sufficient, and

request that the Court find that no further notice of the relief requested herein is required.

WHEREFORE, the Seller respectfully requests that the Court enter an order, substantially in the form filed contemporaneously with this Bidding Procedures Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  October 20, 2014

PACHULSKI STANG ZIEHL & JONES LLP

_James E. O'Neill_

Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (Bar No. 4042)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:          jpomerantz@pszjlaw.com
                    joneill@pszjlaw.com
                    jfried@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

DOCS_LA:281796.12 87714/001