IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ULTURA (LA) INC., et al.,[1] | ) | Case No. 14-12382 (KG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF GRANT LYON IN SUPPORT OF FIRST DAY MOTIONS

I, Grant Lyon, hereby declare that the following is true to the best of my

knowledge, information and belief:

### INTRODUCTION

1.     I am currently serving as the President and Chief Executive Officer of Ultura

(LA) Inc. ("Ultura LA") and the President of Ultura (Oceanside) Inc. ("Ultura Oceanside"). I

submit this declaration (the "Declaration") in support of the petitions and "first day" motions and

applications filed by the above-captioned debtors and debtors in possession (collectively, the

"Debtors"), which are described further below (collectively, the "First Day Motions").

2.     Except as otherwise indicated, I have personal knowledge of the information

contained herein, either directly or through members of management of the Debtors, or the

Debtors' other advisors, and am competent to testify as to the matters set forth herein.

Specifically, I have been directly involved in the matters leading up to these chapter 11 filings,

including financial planning, forecasting, and the restructuring process.  I also have been directly

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ultura (LA) Inc. (9624) and Ultura (Oceanside) Inc. (6429).  The mailing address for each of the Debtors is:  3605 Long Beach Blvd., Suite 201, Long Beach, CA 90807.

involved in negotiations with key creditor constituencies and the sale process described herein. I

am authorized to submit this declaration on behalf of the Debtors.

3.      I am a Managing Director of KRyS Global USA, an international financial

advisory firm. Prior to joining KRyS Global USA, I was a managing director and sole principal

of Odyssey Capital Group. Prior to that, I worked as a managing director at two international

accounting firms. I have also served in executive positions in both publicly traded and private

companies, including as the Interim Chief Financial Officer of Hypercom Corporation

(NYSE:HYC), and the Chapter 11 Trustee or Chief Restructuring Officer of multiple other

chapter 11 cases.

4.      I hold a bachelor of science degree in accounting and a master of business

administration degree, both from Brigham Young University. I am a certified public accountant

in the state of Arizona.

5.      The Debtors commenced these bankruptcy cases in order to effectuate a sale of

the assets or wind-down of Ultura LA and to facilitate a going concern sale of the membrane

business of Ultura Oceanside. Immediately prior to the Petition Date, Ultura Oceanside entered

into that certain Asset Purchase Agreement dated October 20, 2014 (the "Agreement") by and

between Ultura Oceanside and UAC Finance, Inc. ("UAC" or "Stalking Horse Bidder"), an

affiliate of True North Venture Partners, LP ("True North"), for the sale of substantially all of its

assets to UAC in a $25,000,000 transaction consisting of a credit bid by UAC of a portion of its

secured debt of $24,415,000 and an assumption of assumed liabilities, which liabilities include

the payment or assumption by UAC of up to $585,000 of liabilities incurred in the ordinary

course of business, which I believe constitutes all known claims against Ultura Oceanside. The APA is subject to any higher and better overbids.

6.      Part I of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part II of this Declaration sets forth the relevant facts supporting certain of the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions (as defined below).[2]

## PART I

### A.    Overview of the Debtors

7.      Together with their non-debtor affiliates (the "Companies"), the Debtors are a design, engineering, manufacturing and services organization with over 40 years of experience. The Companies offers products and services for the difficult-to-treat waters and substances used in a wide-range of markets including the treatment of toxic leachate from landfills, rare earths and mining, on-vessel water/waste water treatments, treatment of upstream and downstream water in the oil & gas industry, electro-coating for manufacturing paint lines, food and beverage, and advanced process separations for life sciences.

8.      The Companies have two primary lines of business—(i) the Advanced Oxidative Products ("AOP") Business; and (ii) the Membrane Business. The AOP Business is operated primarily through Ultura Inc., the ultimate parent of Ultura Oceanside, which is not a Debtor in these proceedings.

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

9.     The Membrane Business is operated through Ultura Oceanside, which is located in Oceanside, California. Ultura Oceanside is a membrane development, manufacturing, and process application company that produces thirty-seven different membranes, each with its own specialized flux and rejection characteristics. Each membrane can be assembled into a variety of elements and modules. The membrane products are marketed under the Rochem® and Sepro™ brands.

10.     Ultura Oceanside products are used in a variety of applications, including marine desalination systems, landfill leachate systems, dairy applications, automobile paint line and a multitude of other difficult-to-treat membrane applications. There is also a robust aftermarket business for the servicing of membrane systems and modules, with sales in excess of $4 million. The majority of these sales derive from its non-debtor affiliate, Ultura GmbH and, to a lesser extent, Ultura LA.

11.     Ultura LA served as the domestic sales arm for the landfill leachate systems manufactured by Ultura GmbH. Until August 2, 2014, Ultura LA also staffed and operated a landfill leachate operation for Waste Management at Grows, Pennsylvania. The Waste Management operating contract and the associated accounts payable were transferred to an unrelated third party prior to the Petition Date. Ultura LA is no longer selling landfill leachate systems, but it continues to provide products and services to existing customers as the U.S. arm of the Company's aftermarket business. Ultura LA's headquarters are in Long Beach, California.

12.     For the fiscal year ending 2013, on a consolidated basis, the Debtors and their non-debtor affiliates had $56.074 million in revenue, posted a net loss of $8.152 million and had negative EBITDA of $2.107 million.  The Companies listed assets at book value of $84.1 million against liabilities of $82.36 million.  For the same time period, Ultura Oceanside had total revenue of $11.057 million and EBITDA of $275,477.  For the same time period, Ultura LA had revenue of $6.254 million and negative EBITDA of $1.374 million.

**B.     Corporate Organization and Ownership**

13.     Ultura LA is a Delaware corporation and is licensed to operate in the following states:  DE, CA, IN, SC, FL, OH, FL and PA.

14.     Ultura Oceanside is a California corporation and is licensed to operate in California.

15.     The Debtors are two affiliated, privately-held companies, which are both owned directly or indirectly by Ultura Inc., fka APTwater, Inc. ("Parent").  Parent is not a debtor in these proceedings.  Parent owns 100% of the equity of Ultura LA, a Delaware corporation.  Ultura Oceanside is a wholly owned subsidiary of Rochem AG, which in turn is a wholly owned subsidiary of Ultura (Switzerland) GmbH, which is a wholly owned subsidiary of Parent.  Attached hereto as **Exhibit A** is a corporate organization chart.  The Debtors also have non-debtor foreign affiliates in Singapore, Switzerland, Germany, Italy, and the United Kingdom, all of whom are direct or indirect subsidiaries of Parent.

16.     Parent has four principal shareholders controlling 75% of the voting equity before consideration of convertible bridge notes:  (i) Kleiner Perkins Caufield & Byers through KPCB

Holdings, Inc. (36% on a fully diluted basis) ("KPCB"); (ii) XPV Capital through XPV SP7

Limited Partnership, XPV Water Fund (US) Limited Partnership, and XPV Water Fund Limited

Partnership (20.4%) (collectively, "XPV"); (iii) Waste Management Organic Growth (10.9%)

("WM"); and (iv) Seacap APT Leasing (7.76%). In total, Parent is owned by 85 individuals or

entities, the majority of whom own less than 1% of its equity.

17.    The board members of Ultura Oceanside are: myself, Mike Carmel, Randall

Blank, and Steven Jackson.

18.    The board member of Ultura LA as of the Petition Date is Steven Jackson.

**C.    Intercompany Transactions**

19.    All of the Debtors' corporate office and back-office support, including human

resources, payroll, accounts payable, and accounting functions, are performed by Parent. Parent

also employs all of the employees who support the Debtors and is the primary insured party on

all of the Debtors' insurance policies. In addition, Parent is the named counterparty of several

contracts under which Ultura Oceanside acts as the fulfillment agent. Historically, Ultura

Oceanside incurred the costs of fulfilling these contracts and received the net revenue under the

contracts from Parent after payment of Ultura Oceanside's overhead costs. Inasmuch as Parent

is not a debtor in these cases, during the course of these cases and in the ordinary course of the

Debtors' operations, the Debtors will collect the gross amount of their receivables, Parent will

continue to provide employees and services to the Debtors, and the Debtors intend to continue

making payments to Parent to reimburse Parent for their allocable share of corporate overhead to

the extent consistent with the terms and conditions of the Financing Order.

20.    In addition, Ultura LA purchases the chemicals used in its aftermarket sales business and historically purchased systems and other products from its non-debtor affiliate, Ultura GmbH ("Germany").  During the course of these cases, Ultura LA intends to continue to purchase products it needs to service its customers from Germany to the extent consistent with the terms and conditions of the Financing Order.

21.    Ultura Oceanside sells its products through Germany in the European and Middle Eastern markets in exchange for a fee, and will continue to do so until the sale of the Membrane Business.  Ultura Oceanside also purchases materials for module production from Germany as well as its non-debtor affiliate Ultura (Rostock) GmbH ("Rostock"), and may continue to make purchases from its non-debtor affiliates during these cases to the extent consistent with the terms and conditions of the Financing Order.

**D.    Summary of Prepetition Debt**

**(i)    Senior Secured Credit Facility**

22.    Prior to the Petition Date, the Debtors and certain affiliates entered into a loan (the "Prepetition Loan") with Hercules Technology Growth Capital, Inc. ("Hercules") evidenced by, among other things, the following documents, instruments, and agreements (collectively, the "Prepetition Loan Documents"):  (1) Loan and Security Agreement dated as of September 29, 2013, by and between APTwater, Inc. and Hercules; (2) Joinder Agreement dated as of September 9, 2013, by and between Rochem Membrane Systems, Inc. (n/k/a Ultura LA) and Hercules; (3) Joinder Agreement dated as of November 15, 2013, by and between Sepro Membranes, Inc. (n/k/a Ultura Oceanside) and Hercules; (4) Amendment to Loan dated as of July 4, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and

Hercules; and (5) Second Amendment to Loan Agreement ("Second Loan Amendment") dated as of August 25, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and UAC Finance, Inc. (as successor to Hercules) ("UAC" or "Prepetition Lender").

23.    The Loan and Security Agreement and the Joinder Agreement granted Hercules a security interest against substantially all assets of the Debtors, including but not limited to the Receivables, Equipment, Fixtures, General Intangibles, Inventory, Investment Property of the capital stock of any Foreign Subsidiary that constitutes a Permitted Investment, Deposit Accounts, Cash, Goods (each as defined in the Prepetition Loan Documents), and all other tangible and intangible personal property of the Debtors, including all proceeds of the foregoing.

### (ii)    UAC Purchase of Hercules Loan

24.    Pursuant to that certain Loan Sale Agreement dated as of August 7, 2014 by and between Hercules and UAC, Hercules transferred to UAC all of its right, title and interest in, to and under the Prepetition Loan and the Prepetition Loan Documents.  Thereafter, UAC agreed to continue funding Ultura Oceanside's operations pursuant to the terms of the Second Loan Amendment.

25.    UAC advised the Debtors that, based upon various defaults, the financial liquidity issues of the business, and the ongoing need for funding, UAC was unwilling to advance additional funds unless certain changes were made to the management of the business.  Pursuant to the Second Loan Amendment, UAC agreed to continue funding the Debtors' operations upon the creation of a three-member restructuring committee (the "Restructuring Committee") with broad authority to direct matters relating to the restructuring of Ultura Oceanside.  UAC identified Grant Lyon and Michael Carmel as two potential members of the Restructuring

Committee, which were acceptable to Parent and Ultura Oceanside. The third member of the Restructuring Committee is Randall Blank, who has been serving as a director of Parent. Grant Lyon is also the President and Chief Executive Officer of Ultura LA and the President of Ultura Oceanside.[3]

26.    As of the Petition Date, the amounts due and owing under the Prepetition Loan and Prepetition Loan Documents were not less than the:

> (i)    unpaid principal in the amount of $23,063,981;
>
> (ii)    accrued but unpaid interest on the Prepetition Loan in the amount of $159,358, which interest continues to accrue from and after the Petition Date; and
>
> (iii)    accrued and unpaid fees and expenses of UAC and its professionals incurred through the Petition Date, including prepayment fees, end of term charges, and amendment fees of $1,108,566, plus unliquidated amounts of fees and expenses which have accrued prior to the Petition Date and amounts which will continue to accrue subsequent to the Petition Date.

**(iii)    Unsecured Obligations**

27.    The Debtors incur trade debt in the ordinary course of their business. As of the Petition Date, at least $681,000 is owing to third party vendors of both Debtors on account of unsecured obligations.

**E.    <u>Significant Acquisitions and Obligations Related Thereto</u>**

28.    In 2011, Parent acquired Rochem AG ("<u>Rochem</u>"). Rochem had over forty years of experience in the leachate and marine solutions business. As part of its efforts to acquire Rochem, Parent embarked on an effort to raise capital through the issuance and sale of Series C

---

[3]  The Restructuring Committee was also created at Ultura Inc.

Preferred Stock.  On or about September 8, 2011, Parent and True North, a venture capital fund

and affiliate of UAC, entered into a stock-purchase agreement pursuant to which True North

purchased approximately $23.5 million of Ultura Inc. preferred stock and took a seat on Parent's

board of directors, which it subsequently relinquished.  The amount owing to True North in

connection with its investment with Parent to finance the Rochem acquisition was eventually

converted into secured indebtedness (the "Exchange Notes") against Parent to resolve litigation

between Parent and True North.  The Exchange Notes held by True North are not asserted

against the Debtors.

29.     On November 8, 2011, Parent purchased the foreign subsidiaries of Rochem

through its wholly owned subsidiary, Ultura (Switzerland) GmbH (formerly APT-Rochem

Holdings GmbH) ("GmbH"), which then acquired all of the outstanding stock of Rochem AG

and Parent acquired all of the outstanding stock of Ultura (LA) Inc. (formerly Rochem

Membrane Systems, Inc.), pursuant to a Share Purchase Agreement.

30.     The consideration for the Rochem stock purchase consisted of $34 million in

cash, approximately 3.2 million shares of common stock of Ultura Inc., and two sellers' notes,

both of which become due on November 18, 2014.  As of July 31, 2014, one of the sellers' notes

is a liability of Rochem AG and represents a potential liability of $13,520,525.  The other sellers'

note is a liability of Ultura LA owed to Dr. Hans J. Rohrer, with a potential liability of

$4,268,933.00 on an unsecured basis.  In addition to the foregoing liabilities, Dr. Rohrer asserts a

claim against GmbH in the amount of €2,238,661.67.  The claim arises in connection with a

portion of the purchase price which was held back by GmbH pending the final determination of

certain tax liabilities potentially owed by GmbH in connection with the Share Purchase

Agreement. Under the terms of the Share Purchase Agreement, if the tax payment is less the

€2,463,00.00 set aside in the Share Purchase Agreement, then Rochem AG is require to pay the

Rohrer the difference in cash. The litigation is ongoing and recently the German court ruled in

favor of Rochem AG that the tax payment is not yet due. However, Rohrer has a right to appeal

this ruling. Thus, the amount of Dr. Rohrer's claim against Rochem AG is uncertain.

      31.     In 2008, Rochem established a joint venture with Sojitz, a Japanese company, and

formed Sepro Membranes Inc. ("Sepro"). Rochem was a 50% owner of Sepro. Sepro, now

Ultura Oceanside, operates the Membrane Business discussed above. On September 29, 2013,

Rochem acquired the remaining 50% of the interests of the Sepro joint venture through a stock

purchase agreement from Sojitz.

      **F.**     **Events Leading to Chapter 11 Filing**

      32.     Beginning in 2012, the Companies expanded into new markets, channels, and

products, which expansion was not matched by corresponding sales and growth in revenue. The

Companies built their infrastructure based on projected revenues; when the revenues did not

materialize, the Companies began experiencing a liquidity crisis. In addition, the Companies'

liquidity was further adversely affected due to losses at certain of their non-debtor foreign

affiliates, Ultura Germany and Ultura Italy.

      33.     On March 10, 2013, the Companies retained Greentech Capital Advisors, an

investment banking firm, to run a dual process – either a sale of the Companies or a private

placement. Greentech contacted 133 strategic and 169 financial investors globally. While

Parent was able to raise $7.5 million from the Bridge Note Holders (KPCB, WM, and XPV), the Companies received no bids due to the lack of EBITDA, new management, and lack of "scores on the board". Potential investors also cited the need for Ultura Oceanside to acquire 50% of the remaining interest in the Sepro JV. Given that Sepro had valuable technology and was key to the Companies' growth strategy, Ultura Oceanside took steps to acquire the remaining interest in Sepro, which it successfully completed in September 2013.

34. The Companies were successful at raising bridge financing in the form of the Hercules Loan discussed above, which consisted of a term loan of $18 million and a $4.5 million revolver on September 30, 2013. The Debtors utilized a portion of the Hercules financing to acquire the remaining 50% interest in the Sepro JV.

35. Despite the additional rounds of cash infusions and acquisition of valuable assets such as Sepro, such efforts were insufficient to sustain the Companies for a prolonged period of time. The Companies' continued lack of revenue cause it to experience a liquidity crisis in 2014. During 2014, the Companies aggressively cut costs and exited unprofitable, non-core businesses to correctly align their infrastructure to match their revenue. Among other restructuring items, the Companies (i) significantly reduced the number of its general and administrative employees and related expenses, (ii) restructured its sales force, (iii) exited from unprofitable contracts, and (iv) reduced the Companies' footprint by terminating operating leases and moving into smaller headquarters. Parent's CEO and most of its senior management team were replaced in June 2014 with an interim Chief Restructuring Officer, and again on August 28, 2014 when I was appointed

the President of Ultura Oceanside.  I was appointed the President and Chief Executive Officer of Ultura LA on October 3, 2014.

### G.    Ultura Oceanside Sale

36.    As part of the Companies' restructuring efforts, the Companies determined to undergo a sale process for all or a part of its business lines.  Significant efforts were undertaken by both the Seller and Wedbush Securities Inc. to market the Acquired Assets.  The potential sale was featured in *Global Water Intelligence* ("GWI"), an industry publication, on July 14, 2014.

37.    On July 1, 2014, the Companies engaged Wedbush Securities, Inc. ("Wedbush") to sell various assets of the Companies, including the Membrane Business.  Wedbush prepared marketing materials, including an executive summary ("Teaser") and a management presentation, and an online data site with diligence materials.  Wedbush distributed approximately 175 Teasers to industry participants, strategic and financial investors, and other potential buyers.  Approximately 60 parties returned executed confidentiality agreements and were provided with access to the online data site.

38.    In the interim and as noted above, on August 7, 2014, Purchaser acquired the Debtors' outstanding secured indebtedness, and subsequently submitted the only bid for Ultura Oceanside's assets -- the Membrane Business.  Ultura Oceanside began an extensive negotiation with the Purchaser relating to the potential sale and, beginning in late September 2014, Wedbush also re-approached 19 of the potential strategic buyers that had indicated the most interest for a stand-alone Membrane Business.  No party submitted an offer for the Membrane Business at the time the negotiations were occurring with Purchaser.

39.     Ultimately, after extensive negotiations, Ultura Oceanside and the Purchaser entered into the Agreement.  As noted above, the consideration for the purchase of the Acquired Assets under the Agreement is (i) the assumption or payment of all known trade claims against the Seller up to a cap of $585,000 (which is estimated to equal 100% of trade claims); and (ii) Purchaser's credit bid against the DIP Loan and a portion of the Prepetition Loan.

40.     Wedbush continues to aggressively market the Membrane Business for sale.  I believe that the approximately six weeks from Petition Date to the proposed bid due date of November 25, 2014 will be sufficient to adequately market the assets and hopefully lead to a robust auction.

## H.     **Chapter 11 Process**

41.     The Debtors commenced these cases in order to maximize the value of their assets via a going concern sale of the Debtors' profitable business operations -- the Membrane Business and to protect and preserve the U.S. aftermarket business that is operated by Ultura LA.[4]  The Debtors believe a going concern sale of these businesses, whether to UAC or a higher and better overbidder, will best serve both creditor and equity constituencies.  The Debtors anticipate that the Membrane Business will sell for a price that will allow the Debtors to pay off all ordinary course trade debt at Ultura Oceanside.

42.     The Company is also in the process of selling its aftermarket business in Germany, for which Ultura LA provides support.  The assets at Ultura LA will either be sold

---

[4] This business will likely be sold in connection with the sale of the European aftermarket business.

during the chapter 11 proceedings or wound down in connection with the sale of the Companies'
global aftermarket business.

## PART II

**A.**    **First Day Motions**

43.    In order to enable the Debtors to minimize the adverse effects of the
commencement of these Cases, the Debtors have requested various types of relief in the motions
filed concurrently with this Declaration (each, a "First Day Motion" and collectively, the "First
Day Motions").

44.    I have reviewed each of these First Day Motions (including the exhibits and
schedules thereto), and I incorporate by reference the factual statements set forth in the First Day
Motions. The facts stated therein are true and correct to the best of my knowledge, information
and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a)
necessary to enable the Debtors to operate under chapter 11 with minimal disruption to their
current business operations; and (b) essential to maximizing the value of the Debtors' assets for
the benefit of their estates and creditors.

45.    It is my further belief that, with respect to those First Day Motions requesting the
authority to pay prepetition claims or to continue selected prepetition programs (e.g., those First
Day Motions seeking relief related to the Debtors' obligations to their employees, customers,
vendors, and certain taxing authorities), the relief requested is essential to the Debtors' efforts to
preserve and maximize value in these cases and avoid immediate and irreparable harm to the
Debtors and their estates.

46.    I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estates, to the detriment of all of the Debtors' stakeholder constituencies.  The Debtors believe that payment of the prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

**B.    Debtors' Motion for Orders (I) Approving Ultura (Oceanside) Inc.'s Postpetition Financing; (II) Authorizing Debtors' Use of Cash Collateral; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying Automatic Stay; and (VI) Scheduling a Final Hearing ("Financing Motion")**

47.    Ultura Oceanside determined that it will not be able to, subsequent to the week ending November 8, 2014, adequately finance its business operations by using only cash collateral and that it requires access to additional financing after such date.  To fund this shortfall, Ultura Oceanside solicited offers from 22 entities before the Petition Date to finance its operations during its bankruptcy case.  Although 8 of the 22 entities expressed an interest in providing postpetition financing, each declined the opportunity because they could not compete against UAC's below market terms.  In addition, UAC would not consent to priming liens and advised the Debtors that it would have argued that the Debtors could not have provided adequate protection for the proposed financing.  By contrast, Ultura LA determined that it is able to adequately finance its business operations throughout its chapter 11 case by using cash collateral in the amounts and categories set forth on the budget attached to the Interim Order as Exhibit A-2 (the "LA Budget") and therefore does not need access to additional financing.

48.    Ultura Oceanside determined that its working capital needs can be met with the use of cash collateral and, following the week ending November 8, 2014, a loan up to

the amount set forth on the budget attached to the Interim Order as Exhibit A-1 (the "Oceanside Budget" and, together with the LA Budget, the "Budgets"). Subject to the entry of a Final Order, Ultura Oceanside shall use the proceeds of the DIP Loan (as defined below) for the purposes set forth in the Oceanside Budget, subject to the terms and conditions identified in the Orders ("Permissible Uses").

49.    UAC has agreed, subject to the entry of a Final Order acceptable to UAC in its sole discretion, to advance to Ultura Oceanside up to a maximum principal amount of the amount set forth in the Oceanside Budget (the "DIP Loans"). Such DIP Loans will be on a senior secured superpriority basis and on the terms and conditions of the Final Order solely for Permissible Uses under the Oceanside Budget.

50.    I believe Ultura Oceanside's access to sufficient working capital and liquidity through the DIP Loans is vital to the preservation and maintenance of the going-concern value of its business and assets. Despite its efforts, Ultura Oceanside is unable to obtain financing on more favorable terms from sources other than UAC under this Interim Order and is unable to obtain adequate unsecured credit allowable under sections 364(c)(1) or 503(b)(1) of the Bankruptcy Code as an administrative expense. Ultura Oceanside is also unable to obtain secured credit from sources other than UAC that would be allowable under section 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. Accordingly, I believe the DIP Loans as set forth in the DIP Financing Motion is the best interests of Ultura Oceanside and its estate.

**C.    Motion of Debtors for Order under Sections 105, 345, 363, 503(b), 1107 and 1108 of the Bankruptcy Code Authorizing Maintenance of (I) Existing Bank Accounts, (II) Existing Cash Management System, Bank Accounts, Checks and Related Business Forms, (III) Performance of Intercompany Transactions and Providing Administrative Priority Status to Postpetition Intercompany Claims; and (IV) Related Relief ("Cash Management Motion")**

51.    Pursuant to the Cash Management Motion, the Debtors request authorization for the (i) maintenance of existing bank accounts including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) continued use of the existing cash management system for the Debtors, and (iii) continued performance of intercompany transactions and provision of administrative priority to postpetition intercompany claims, among other relief requested.

52.    The Debtors' Bank Accounts as listed on Exhibit A to the Cash Management Motion are part of a carefully constructed automated cash management system that ensures the Debtors' ability to efficiently monitor and control all of their cash receipts and disbursements. I believe closing the existing Bank Accounts and opening new accounts would disrupt the Debtors' businesses and result in delays impeding the Debtors' ability to transition smoothly into chapter 11, and would likewise jeopardize the Debtors' efforts to successfully reorganize in a timely and efficient manner.

53.    I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines (the "UST Guidelines") to (i) close all of their existing bank accounts and (ii) open new "debtors in possession" bank accounts. If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtors' activities and would

impair the Debtors' ability to operate under chapter 11. Accordingly, the Debtors seek a waiver of these requirements to the extent set forth in the motion.

54.    The cash management procedures utilized by the Debtors are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to control corporate funds centrally, segregate cash flows, ensure availability of funds when necessary, and reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

55.    The operation of the Debtors' business requires that the Cash Management System continue during the pendency of these Chapter 11 Cases. Requiring the Debtors to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully. Indeed, requiring Cash Management System changes could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while systems were changed. I believe that maintenance of the existing Cash Management System and granting the relief requested in the motion is therefore in the best interests of all creditors and other parties-in-interest.

**D.    Motion of Debtors Authorizing Certain Intercompany Allocations and Reimbursements in Accordance with 11 U.S.C. §§ 363 and 364**

56.    Parent is a joint borrower with the Debtors under the Prepetition Loan Documents. Prior to the Petition Date, Parent received a portion of the loan proceeds, collected a

the Debtors' revenue, and paid all of the Debtors' operating expenses, including (a) all wages for

the Parent's employees who were performing services (the "Employee Services") for the Debtors

and (b) certain other general and administrative corporate expenses (the "Expenses").

57.    Pospetition, pursuant to the Financing Motion, the Debtors will be funding their

operations through either the use of cash collateral or debtor in possession financing.

Specifically, through the Financing Motion, the Debtors request entry of an order authorizing

them to use cash collateral (the "Cash Collateral Order") on an interim and final basis and for

Ultura (Oceanside) Inc. to become a borrower under the DIP Loans (as such term is defined in

the Financing Motion) (the "DIP Order").  Collectively, the Cash Collateral Order and DIP Order

are referred to as the "Financing Orders".  The employees, however, continue to be engaged by

the Parent and Parent continues to incur corporate and administrative expenses on behalf of the

Debtors.  Given the DIP Loans and the commencement of the Chapter 11 Cases, the Debtors

propose that the Parent will pay the cost of the Employee Services and Expenses on behalf of the

Debtors and the Debtors will reimburse the Parent in accordance with the Budgets and terms set

forth in the Financing Orders.  Any unsecured debt on account of the reimbursement will be

accorded administrative priority under section 503(b) of the Bankruptcy Code and the Debtors

will repay such obligation from cash collateral or the proceeds of the DIP Loans using property

of the estate as contemplated under the applicable Financing Orders.

58.    Specifically, the Budgets attached to the Financing Orders include line items for

"Employee Reimbursement" and "Corporate Reimbursement."  These line items represent

reimbursement for direct costs (without markup) of the Employee Services and reimbursement of

the Expenses based on an allocation between the Debtors (98%) and Parent (2%). The allocation

of the Debtors' 98% share is: 85% for Ultura Oceanside and 15% for Ultura LA.

59.    Without the provision of the Employee Services and the payment of the Expenses,

the Debtors would not be able to operate, given that the Parent does not have the available funds

to pay those employees who are providing services for the Debtors. The treatment proposed

does not differ significantly from prior practice. Parent's advancing of the cost of the Employee

Services and the Expenses allows the Debtors to continue their operations. Any alternate

structure may result in disruption or significant damage to the Debtors' businesses.

**E.    Motion of the Debtors For an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance of Payment ("Utility Motion")**

60.    Pursuant to the Utility Motion, the Debtors request entry of an order (a)

prohibiting the Utility Providers from altering, refusing or discontinuing service; (b) deeming the

Utility Providers adequately assured of future performance; and (c) establishing procedures for

determining additional adequate assurance of future payment.

61.    The Debtors receive essential utility services from a number of utility companies.

In the normal course of their daily business operations, the Debtors have relationships with

various utility companies and other providers (each a "Utility Provider" and collectively, the

"Utility Providers") for the provision of telephone, cellular phone, gas, electricity, water, trash

and other related services. The Debtors estimate that their average monthly payments to the

Utility Providers aggregate approximately $37,100.

62.    At this critical time, and given the nature of the Debtors' business, continued and uninterrupted utility service is essential to the Debtors' ongoing operations.  The Debtors use the power generated by the utilities to run their systems and operate their facilities, which is engaged in the production of modules.  If the Debtors lost any utility service at their business sites, the Debtors would be unable to operate, causing immediate and irreparable harm.  It is therefore critical that the Court prohibit the Utility Providers from altering, refusing, or discontinuing service to the Debtors.  Therefore, I believe the relief requested in the utilities motion is essential to these estates and their reorganization efforts.

**F.    Motion of Debtors for an Order Authorizing, But Not Directing, Payment of certain Prepetition Shipping Obligations in the Ordinary Course of Business ("Shipping Motion ")**

63.    Pursuant to the Shipping/Warehouse Motion, the Debtors request entry of an order authorizing but not directing, payment of certain prepetition shipping obligations in the ordinary course of business.

64.    Ultura LA purchases goods necessary to service the systems and modules in place at various customer locations, which are necessary and essential for the smooth functioning of those systems.  In addition, Ultura Oceanside purchases parts and components necessary to build its membrane systems and uses the services of Shippers to deliver the systems to their customer sites.  The Shippers include various third party carriers such as UPS and FedEx and other larger common carriers for their orders and shipments.   The Debtors also utilize the services of shipping brokers or agents.  The Debtors estimate that, as of the Petition Date, approximately $25,834.75 remains owing to the Shippers on account of prepetition Shipping Obligations.

65.    The Debtors expect that, as of the Petition Date, the Shippers may have

outstanding invoices for merchandise delivered to the Debtors prior to the Petition Date.

Because the Debtors' business depends on the supply of certain products, even minor disruptions

in the shipping process could be disastrous for the going concern value of the Debtors' business.

66.    The Debtors' business depends on the timely and accurate shipping of products to

operate successfully.  Any disruption in the shipping process would necessarily damage the value

of the Debtors' business.  In addition, the Debtors cannot replace the existing Shippers without

significant disruption to their business as the Debtors rely on their arrangements with Shippers

and need such arrangements to remain intact by making timely payment of the Shipping

Obligations.

67.    The Debtors represent that they will only pay Shipping Obligations where they

believe, in their business judgment, the benefits to its estate and creditors from making such

payments would exceed (a) the costs that the estate would incur by bringing an action to compel

the turnover of such goods, and (b) the delays associated with such actions.  The Debtors do not

expect such payments to exceed $27,500.

**G.    Application for an Order Appointing as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(C), 11 U.S.C. § 105(A) and LBR 2002-1(F) ("Notice and Claims Agent Application")**

68.    Pursuant to the Notice and Claims Agent Application, the Debtors are seeking

authority to retain Rust/Omni as their Claims and Noticing Agent.  The Debtors have evaluated

several potential candidates to serve as their Claims and Noticing Agent.  Following that review,

and in consideration of the number of anticipated claimants and parties in interest, the nature of

the Debtors' business, and the scope of tasks for which the Debtors will require the assistance of

a Claims and Noticing Agent, the Debtors submit that the appointment of Rust/Omni as Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates.

69.    The Debtors estimate that there are hundreds of creditors holding claims against the Debtors' estates, including former employees and other parties-in-interest who require notice of various matters, and in particular the deadline for filing proofs of claim. Additionally, many of these parties may file proofs of claim.

70.    I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Cases and other developments in the Cases. Accordingly, I respectfully request that the Court authorize the Debtors to retain Rust/Omni.

**H.    Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only ("Joint Administration Motion")**

71.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of these cases, for procedural purposes only. I believe that many of the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief sought jointly by all of the Debtors. I believe that joint administration of the Debtors' chapter 11 cases, for procedural purposes only, under a single docket entry, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of two independent chapter 11 cases.

72.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of October, 2014, at Long Beach, California.

_____