IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ULTURA (LA) INC., et al.,[1] | ) | Case No. 14-12382 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**[Requested] Hearing Date:  November 25, 2014 at 1:00 p.m. (Eastern Time)**
**[Requested] Objection Deadline: November 25, 2014 at 12:00 p.m. (Eastern Time)**

**ULTURA (OCEANSIDE) INC.'S MOTION FOR ORDER (A) APPROVING
ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL ASSETS OF ULTURA (OCEANSIDE) INC. OUTSIDE THE
ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND
OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b),
363(f) AND 363(m); (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING RELATED RELIEF**

Ultura (Oceanside) Inc., one of the above-captioned the debtors ("Oceanside" or the

"Seller"), files this motion (this "Sale Motion") for entry of an order:  (a) approving the *Asset*

*Purchase Agreement* dated November 19, 2014 between Oceanside, as seller, and UAC Finance,

Inc. (the "Purchaser" or "UAC"), as buyer (the "Agreement" or the "APA")  a copy of which is

attached hereto as **Exhibit A**,[2] authorizing the sale (the "Sale") of substantially all the assets of

Ultura (Oceanside) Inc. (the "Acquired Assets"); (b) authorizing the sale of the Acquired Assets

free and clear of all liens, claims, rights, encumbrances, and other interests pursuant to sections

105, 363(b), 363(f), and 363(m) of the Bankruptcy Code; and (c) granting related relief.

In support of this Sale Motion, the Seller respectfully states as follows:

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are:
Ultura (LA) Inc. (9624) and Ultura (Oceanside) Inc. (6429).  The mailing address for each of the Debtors is:  3605
Long Beach Blvd., Suite 201, Long Beach, CA 90807.
[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.

## Preliminary Statement

1.      By this Sale Motion, the Seller seeks approval of the Sale of Acquired Assets to the Purchaser pursuant to the Agreement.  The proposed Agreement contemplates that the Acquired Assets will be sold free and clear of liens, claims, encumbrances, rights, and other interests other interests other than those liens and interests expressly permitted under the Agreement.

2.      As discussed below, the Sale is in the best interests of each of the Seller and its estate and creditors.  The Sale provides for either the payment or assumption of all known and undisputed trade claims against the Seller (subject to an aggregate cap of $635,000.  The Sale is an integral part of a Global Settlement Agreement as set out in the *Motion for Order Granting Joint Motion of the Debtors and Committee for an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving Global Settlement Agreement Between and Among the Debtors, the Committee, Dr. Hans J. Rohrer, and UAC Finance, Inc.* (the "Global Settlement Motion").  Through the Global Settlement Agreement and the Sale the Debtors will be able to successfully and expeditiously bring a conclusion to these cases in which all known undisputed trade creditors will be paid in full.  Further, given the financial condition of the Seller and the lack of any meaningful working capital, a sale under these conditions is in the best interests of the Seller and its estate.

**Jurisdiction**

3.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C.

§§ 157(b)(2)(A), (M), (N) and (O).

4.      Venue of these proceedings and this Sale Motion is proper in this District

pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 362, 363,

364, 365, 1107, and 1108 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules

2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

**Background**

6.      On October 20, 2014, the Debtors each commenced their respective cases by

filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have

continued in the possession of their property and have continued to operate and manage their

businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

7.      The factual background relating to the commencement of the Debtors' chapter 11

cases (the "Chapter 11 Cases") is set forth in detail in the *Declaration of Grant Lyon in Support*

3

*of First Day Motions* [Docket No. 14] (the "Lyon Declaration") and incorporated herein by reference.

8.    On October 31, 2014, the office of the United States Trustee appointed an official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "Committee").[3]

9.    On the Petition Date, Oceanside filed its *Ultura (Oceanside) Inc.'s Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Substantially All Assets of Ultura (Oceanside) Inc., Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) And 363(m); (C) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 11] (the "Original Sale Motion").

---

[3] On November 10, 2014, the United States Trustee filed an *Amended Notice of Appointment of Creditors Committee* [Docket No. 103] to reflect the resignation of Romaco, BV from the Committee as of November 7, 2014.

4

10.    Following the Committee's appointment on October 31, 2014, the Committee undertook an investigation of the proposed credit bid sale set forth in the Original Sale Motion and postpetition financing through, among other things, analysis of the documents filed in these bankruptcy cases and other operative documents, as well as extensive discussions with the Debtors and UAC.  Through its investigation, the Committee identified concerns with the sale and postpetition financing as proposed in the Original Sale Motion and related motions. These broad issues affected the Debtors, UAC, the Committee's constituencies, and Dr. Hans J. Rohrer (the largest unsecured creditor in these chapter 11 cases), among others.

11.    As a result of extensive good faith settlement negotiations, the Debtors, various affiliate of the Debtors, the Committee, UAC, True North, Dr. Rohrer and various entities related to Dr. Rohrer agreed to resolve these issues and their respective related disputes according to the terms of the Global Settlement Agreement.  The Global Settlement Agreement is the result of arms-length, good-faith negotiations among the parties and is the vehicle through which a sale of Oceanside's assets can occur, certain trade creditor claims are assumed, the Debtors' estates are funded through continued use of cash collateral, provision for certain wind down costs is made and all claims among the Parties are resolved, all as more fully set forth and described in the Global Settlement Motion.  Moreover, as set forth in the Agreement, approval of the Global Settlement Motion is a condition to the closing of the proposed sale of the Acquired Assets to the Purchaser.

DOCS_SF:86586.6 87714/002

## Sale of the Acquired Assets

12.     The Seller seeks approval of the sale of substantially all of its assets used in the operation of its "Membrane Business," which is located in Oceanside, California.  The Seller is a membrane development, manufacturing, and process application company that produces 37 different membranes, each with its own specialized flux and rejection characteristics.  Each membrane can be assembled into a variety of elements and modules.  As a result, the Seller has over 400 SKUs, of which more than 150 are currently active.  The membrane products are marketed under the Rochem® and Sepro™ brands.  On October 16, 2014, Seller purchased certain intellectual property owned by Ultura Inc. necessary for the operation of Seller's business in exchange for $250,000, and which intellectual property is included in the Acquired Assets. The Seller's products are used in a variety of applications, including marine desalination systems, landfill leachate systems, dairy applications, automobile paint line and a multitude of other difficult-to-treat membrane applications.

13.     In light of the prepetition marketing efforts, and based upon the financial condition of Seller's business, the Seller believes that the sale process, while accelerated, provides sufficient time to fully expose the Acquired Assets for sale in the hope of achieving a competitive bidding process.

6

**Marketing Process**

14.     As part of the Seller's restructuring efforts, the Seller determined to undergo a

sale process for all or a part of its business lines. Significant efforts were undertaken by both the

Seller and Wedbush Securities Inc. to market the Acquired Assets. The potential sale was

featured in an article in Global Water Intelligence ("GWI"), an industry publication, on July 14,

2014.

15.     On July 1, 2014, the Seller also engaged Wedbush Securities, Inc. ("Wedbush") to

sell, among other assets, the Membrane Business. Wedbush prepared marketing materials,

including an executive summary ("Teaser") and a management presentation, and an online data

site with diligence materials. Wedbush distributed approximately 175 Teasers to industry

participants, strategic and financial investors, and other potential buyers. Approximately 60

parties returned executed confidentiality agreements and were provided with access to the online

data site.

16.     On August 7, 2014, Purchaser acquired the Sellers' outstanding secured

indebtedness, and subsequently submitted the only bid for Ultura Oceanside's assets -- the

Membrane Business. Oceanside began an extensive negotiation with the Purchaser relating to

the potential sale and, beginning in late September 2014, Wedbush also re-approached 19 of the

potential strategic buyers that had indicated the most interest for a stand-alone Membrane

Business. No party submitted an offer for the Membrane Business at the time the negotiations

were occurring with Purchaser. Postpetition, Wedbush continued to market the Acquired Assets

to parties who had expressed an interest in potentially acquiring such assets.

7

17.    Ultimately, Oceanside and the Purchaser entered into the Agreement, which is attached hereto as **Exhibit A**. As noted above, the consideration for the purchase of the Acquired Assets under the Agreement is (i) the assumption or payment of all known trade claims against the Seller up to a cap of $635,000 (which is estimated to equal 100% of known trade claims against Oceanside); and (ii) Purchaser's credit bid against the DIP Loan plus a portion of the Prepetition Loan (defined below); and (iii) payment to the Seller of $700,000 pursuant to the terms of the Global Settlement Motion.

*Secured Debt Obligations Owing to Purchaser*

18.    Prior to the Petition Date, the Debtors and certain affiliates entered into a loan (the "Prepetition Loan") with Hercules Technology Growth Capital, Inc. ("Hercules") evidenced by, among other things, the following documents, instruments, and agreements (collectively, the "Prepetition Loan Documents"):  (i) Loan and Security Agreement dated as of September 29, 2013, by and between APTwater, Inc. (n/k/a Ultura Inc.) and Hercules; (ii) Joinder Agreement dated as of September 9, 2013, by and between Rochem Membrane Systems, Inc. (n/k/a LA) and Hercules; (iii) Joinder Agreement dated as of November 15, 2013, by and between Sepro Membranes, Inc. (n/k/a Oceanside) and Hercules; (iv) Amendment to Loan ("First Loan Amendment") dated as of July 4, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Hercules; and (v) Second Amendment to Loan Agreement ("Second Loan Amendment") dated as of August 25, 2014, by and among Ultura Inc., the Debtors, certain other affiliates of the Debtors, and Purchaser.[4] The Loan and Security Agreement and the

---

[4]  In 2011, Ultura, Inc. acquired Rochem AG ("Rochem").  Rochem had over forty years of experience in the leachate and marine solutions business.  As part of its efforts to acquire Rochem, Ultura Inc. embarked on an effort

Joinder Agreement granted Hercules a security interest against substantially all assets of the

Debtors, including but not limited to the Receivables, Equipment, Fixtures, General Intangibles,

Inventory, Investment Property of the capital stock of any Foreign Subsidiary that constitutes a

Permitted Investment, Deposit Accounts, Cash, Goods (each as defined in the Prepetition Loan

Documents), and all other tangible and intangible personal property of the Debtors, including all

proceeds of the foregoing.  The collateral described in this paragraph is referred to herein as the

"Prepetition Collateral."

19.    Pursuant to that certain Loan Sale Agreement dated as of August 7, 2014, by and

between Hercules and Purchaser, Hercules transferred to Purchaser all of its right, title, and

interest in, to, and under the Prepetition Loan and the Prepetition Loan Documents.  Thereafter,

as set forth below, Purchaser agreed to continue funding Oceanside's operations pursuant to the

terms of the Second Loan Amendment.

20.    Purchaser advised the Debtors that, based upon various defaults, the financial

liquidity issues of the business, and the ongoing need for funding, Purchaser was unwilling to

advance additional funds unless certain changes were made to the management of the business.

Pursuant to the Second Loan Amendment, Purchaser agreed to continue funding the Debtors'

operations upon the creation of a three-member restructuring committee (the "Restructuring

Committee") with broad authority to direct matters relating to the restructuring of Oceanside.

---

to raise capital through the issuance and sale of Series C Preferred Stock.  On or about September 8, 2011, Ultura
Inc. and True North Ventures, Inc. ("True North"), a venture capital fund and affiliate of UAC, entered into a stock-
purchase agreement pursuant to which True North purchased approximately $23.5 million of Ultura Inc. preferred
stock and took a seat on Ultura Inc.'s board of directors which was subsequently relinquished.  The amount owing to
True North in connection with its investment with Ultura, Inc. to finance the Rochem acquisition was eventually
converted into secured indebtedness (the "Exchange Notes") against Ultura, Inc. to resolve litigation between Ultura
Inc. and True North.  The Exchange Notes held by True North are not asserted against the Debtors.

Purchaser identified Grant Lyon and Michael Carmel as two potential members of the Restructuring Committee, which were acceptable to Ultura Inc. and Oceanside. The third member of the Restructuring Committee is Randall Blank, who has been serving as a director of Oceanside's ultimate parent, Ultura Inc. Grant Lyon is also the President and Chief Executive Officer of LA and the President of Oceanside.[5]

21.    The Purchaser is also the postpetition lender pursuant to the *Motion of Debtor Ultura (Oceanside) Inc. for Interim and Final Interim Orders under 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing Debtor To (A) Use Cash Collateral and (B) Incur Postpetition Secured Indebtedness; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay and (V) Scheduling a Final Hearing* [Docket No. 15] (the "DIP Motion"), filed concurrently herewith. The DIP Motion seeks, *inter alia*, approximately $1,961,548 million in postpetition financing (the "DIP Loan") in order to fund Oceanside's chapter 11 case. Oceanside is in need of this postpetition financing and continues to operate with a very thin working capital reserve, especially with the increased restructuring costs associated with the chapter 11 case. It is in the best interest of the company and its stakeholders to expedite the sales process in this case. Because of liquidity constraints, the Seller has not been able to inject much needed capital to grow the business. As a result the Seller has been susceptible to competitive pressures which has affected its operating performance.

---

[5] The Restructuring Committee was also created at Ultura Inc.

**Agreement With Purchaser**[6]

22.    The key terms of the Agreement and the Sale Order are summarized below.  The description below only summarizes certain provisions of the Agreement and the Sale Order as a convenience to the Court and parties in interest, and the terms of the Agreement control in the event of any inconsistency.

a.    **Purchase Price and Credit Bid**.  The total consideration to be paid by Purchaser to Oceanside for the Acquired Assets shall be $25,000,000, which is comprised of (i) a credit bid amount equal to all outstanding obligations owed by Oceanside to Purchaser under the DIP Loan; (ii) a credit bid of a portion of the obligations owing under the Senior Secured Loan; (iii) the assumption of up to $635,000 of Assumed Liabilities under the APA; and (iv) the amount of $700,000 to be paid to Seller pursuant to Global Settlement Motion.  Included in the Assumed Liabilities are the costs required to assume and assign the designated executory contracts and unexpired leases (the "**Assigned Contracts**") included in the Acquired Assets. *See* APA, § 3.1.

b.    **Purchased Assets**.  The Acquired Assets (inclusive of the Oceanside Assigned Contracts) are those assets necessary to operate Oceanside's business, including, but not limited to:  Oceanside's Inventory; fixed assets; cash and cash equivalents (other than as provided under the DIP Budget and Global Settlement Order and Wind-down Budget); the Oceanside Assigned Contracts; intellectual property; transferable license agreements; and software agreements; accounts receivable; tax refunds, rebates and credits and similar items relating to the operation of Oceanside's business; Oceanside's avoidance action claims against vendors of Oceanside's business; Oceanside's claims against current and former officers, directors, employees, members principals agents and representatives; the capital stock of non-debtor Ultura Sales GmbH owned by Oceanside; and copies of Oceanside's books, records, and files. *See* APA, § 2.1(a).  The Acquired Assets do not include the Excluded Assets. The Excluded Assets are set forth in section 2.1(b) of the APA, and include:  certain insurance proceeds to non-acquired property or contracts; claims and causes of action for non-Oceanside Assigned Contracts or property not included as Acquired Assets; the non-Oceanside Assigned Contracts; the capital stock of any other entity (other than Ultura Sales GmbH); tax records, minute and stock transfer books; and existing letters

---

[6] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed in the Agreement.

of credit or financial accommodations issued to third parties, claims against Oceanside's former and current directors and officers, and Oceanside's preference and avoidance actions exclusive of such actions against vendors of Oceanside's business. *See* APA § 2.1(b).

c.    **Closing.** Subject to the terms and conditions of APA, the closing of the purchase and sale of the Acquired Assets (the "**Closing**") will be at 10:00 a.m. Eastern Time at the offices of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, or at such other location agreed to by Purchaser and Oceanside, on the fifth (5th) Business Day following the date of the issuance of the Approval Order, but not later than December 5, 2014 (to the extent Purchaser waives the requirement that the Sale order becomes a final order; however, if Purchaser does not waive such requirement, then such date shall be December 13, 2014), or such other date as may be agreed upon by the Parties. *See* APA, § 4.1.

d.    **Identity of Purchaser.** As noted above, Purchaser purchased the Seller's existing senior secured debt from Hercules Technology Growth Capital, Inc. (the "**Senior Secured Indebtedness**") on or about August 8, 2014. The Purchaser is the current owner of the Senior Secured Indebtedness, which totaled approximately $24,331,905 as of the Petition Date. The Purchaser also agreed to provide postpetition financing in order to fund Oceanside's Chapter 11 Case through the closing of the Sale, as more fully set forth in the DIP Motion. As set forth herein, all known trade claims (subject to a cap of $635,000) against Oceanside will be paid or assumed under the APA.

e.    **Assumption of Executory Contracts and Unexpired Leases.** The proposed sale contemplates that Oceanside may assume and assign to the Purchaser certain of the executory contracts and unexpired leases associated with the Acquired Assets. The schedule (or schedules) of the executory contracts and unexpired leases that the Purchaser may elect to be assumed by Oceanside and assigned to the Purchaser at the Sale Hearing. The Purchaser shall be permitted to delete contracts and leases from the list of Oceanside Assigned Contracts up until the Closing. See APA, § 2.1(iv).

f.    **Representations, Warranties, and Covenants.** The Seller made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, financial statements, absence of changes, authorized capitalization, compliance with laws, licenses, environmental matters, title to assets, contracts, litigation, contracts to be assumed and assigned to the Purchaser, intellectual property, software, taxes, broker's and finder's fees, operation of the Business prior to the Closing, and insurance. *See*

12

APA, §§ 6.1 – 6.4.  The Purchaser has made certain representations, among others, relating to organization and good standing and authorization.  *See* APA, §§ 7.1 – 7.3.  Oceanside also agreed to various covenants including, but not limited to, actions before closing, conduct of business, preservation of documents, access to information, and certain employee matters.  *See* APA, § 8.1.

g.  **Conditions.**  The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including the truthfulness of all representations and warranties, no material adverse change in Oceanside's business, and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained, including entry of the Sale Order and the Global Settlement Order.  The Closing is also conditioned upon (a) the assignment of various agreements critical to Oceanside's operation by Oceanside's ultimate parent, Ultura Inc., to Purchaser and (b) the entry of a transition services agreement between Ultura Inc. and Purchaser.  *See* APA, § 9.1.  The APA also provides that this Sale Motion request that the Bankruptcy Court authorize the Seller to change its legal name in order to strike the words "Ultura (Oceanside), Inc." from such name and alter the captions under which its respective bankruptcy case is administered to as to eliminate the words "Ultura (Oceanside), Inc." from such captions. *See* APA, § 5(e)

h.  **Retention of Employees**.  As a condition to the Closing, the APA provides that (i) on or prior to the Closing Date, the Purchaser shall have concluded that it will have the ability to employ those individuals listed on Schedule 8.11(a); and (ii) the Purchaser shall have reached an agreement and executed employment agreements with those key individuals listed on Schedule 9.1(l).

i.  **Record Retention**.  While Oceanside will provide copies of its books and records to the Purchaser, Oceanside will have access to the books and records to enable it to administer its chapter 11 case.  *See* APA, § 13.16.

### Sale Order[7]

23.  The key terms of the Sale Order are summarized below.  The description below only summarizes certain provisions of the Sale Order as a convenience to the Court and parties in interest, and the terms of the Sale Order control in the event of any inconsistency.

---

[7]  Unless otherwise noted, capitalized terms used but not defined in this section have the meanings ascribed to them in the Sale Order.

    a.   **Rule 6004/6006 Waiver**.  The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006. *See* Sale Order, ¶ 25. As discussed herein, the sale and prompt consummation thereof are in the best interest of the Seller and its estate in order to maintain and otherwise maximize the going concern value of the Seller's assets for the benefit of the estate and to comply with certain timing deadlines as discussed above.

    b.   **Successor Liability Findings.**  The Sale Order provides that the Purchaser and its employees, officers, directors, advisors, lenders, affiliates, owners and successors and assigns shall not have any successor or vicarious liabilities. *See* Sale Order, ¶¶ V and 10.

24.    The Seller believes that the sale of the Acquired Assets as a going concern to the Purchaser is in the best interests of the Seller's estate its creditors. The Debtor further believes that the Sale will provide for either the payment or assumption of all known undisputed trade claims against each of the Seller.

25.    The Seller has examined the alternatives to a sale of the Acquired Assets and has determined that, in light of Oceanside's financial situation, liquidity needs; and the value of the Acquired Assets; a more viable alternative to the sale of the Acquired Assets does not exist. The Seller determined that the sale of the Acquired Assets optimizes value for the estate, which includes the assumption of approximately $635,000 in assumed liabilities, which is believed to provide for payment or assumption of 100% of the known undisputed trade claims against the Seller.

26.    Further, the Sale is an integral part of the Global Settlement Agreement which resolves the various issues in these chapter 11 cases and establishes a mechanism for payment of not only all known undisputed trade claims of Oceanside, but also the known undisputed trade claims of Ultura (LA) Inc. The Sale and Global Settlement Agreement are in the best interests of the estates and are supported by the Committee.

27. For the reasons stated above, and in light of the obvious benefits to the estate, the Seller has determined, in the exercise of its business judgment, to consummate the proposal submitted under the Agreement with the Purchaser.

## Relief Requested

28. The Seller is requesting that this Court, *inter alia*, (a) authorize the private sale of the Acquired Assets to the Purchaser pursuant to the Agreement, (b) authorize such sale of the Acquired Assets to be free and clear of all liens, claims, rights, encumbrances, or other interests pursuant to sections 105, 363(b), 363(f), and 363(m) and 365 of the Bankruptcy Code, with such liens, claims, rights, encumbrances, and interests (collectively, the "**Encumbrances**") attaching to the sale proceeds of the Acquired Assets (the "**Sale Proceeds**") with the same validity (or invalidity), priority, and perfection as existed immediately prior to such sale; and (c) grant such other relief as may be necessary or appropriate.

## Basis for Relief

29. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

30. A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In*

15

*re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

31.    The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

32.    The Seller has proposed the sale of the Acquired Assets after thorough consideration of all viable alternatives and has concluded that the Sale is supported by many sound business reasons. The Seller has extensively marketed the Acquired Assets as described above and believes the proposed Sale reflects the maximum potential purchase price that can be achieved for the Acquired Assets and is an integral part of the Global Settlement Agreement.

33.    The Seller has articulated sound business reasons, set forth above, for a sale of the Acquired Assets on an expedited basis. *See, e.g., In re Tempo Tech.*, 202 B.R. 363, 369-70 (D.

Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) five weeks after the petition date where the debtor was suffering operating losses).

34.    The Seller believes that, as a result of the marketing efforts that have been undertaken, the highest or otherwise best offer achievable is reflected in the Agreement and provides the maximum value to the Seller under the current circumstances. The fairness and reasonableness of the consideration to be paid by the Purchaser is demonstrated by the marketing efforts that the Seller has undertaken as well as the consideration to be provided to the Seller pursuant to the Global Settlement Motion. Accordingly, Oceanside requests approval under section 363(b) of the Bankruptcy Code of the Sale of its assets to the Purchaser, as set forth in the APA.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the
Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

35.    Section 363(f) of the Bankruptcy Code provides:

17

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

36.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests." The term "any interest," as used in section 363(f), is not defined anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in modern cases is toward "a broader interpretation which includes other obligations that may flow from ownership of the Property." *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

18

37.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Acquired Assets free and clear of all of the applicable Encumbrances, except with respect to any Encumbrances permitted under the Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Seller submits that each Encumbrance that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the Sale Proceeds, subject to any claims and defenses the Seller may possess with respect thereto. The Seller accordingly request authority to convey the Acquired Assets to the Purchaser, free and clear of all Encumbrances except for the Encumbrances that are expressly permitted under the terms of the Agreement, with such Encumbrances to attach to the Sale Proceeds, with the same validity (or invalidity), priority, and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the Sale Order.

38.    The Seller has conducted a UCC search and other lien searches of purported lienholders in conjunction with the proposed sale of the Acquired Assets. The Seller has served such purported lienholders with notice of this Sale Motion, and will serve notice of the Sale Order, if and when such order is entered by the Court. Other than the Purchaser's acquisition of the Senior Secured Indebtedness, there were no other known secured creditors of the Seller and the Purchaser has consented to the Sale. Out of an abundance of caution, to the extent there are any remaining other secured creditors, (a) applicable non-bankruptcy law permits the sale of the Acquired Assets free and clear of such creditors' claims, or (b) such creditors could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their claims.

39.     Accordingly, this Court should approve the sale of the Acquired Assets to the Purchaser free and clear of Encumbrances under section 363(f) of the Bankruptcy Code, and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.[8]

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

40.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

---

[8] As set forth in the Motion and in furtherance of the APA, the Seller also requests that the Bankruptcy Court authorize the Seller to change its legal name in order to strike the words "Ultura (Oceanside), Inc." from such name and alter the captions under which its respective bankruptcy case is administered to as to eliminate the words "Ultura (Oceanside), Inc." from such captions.

41.    The Agreement was negotiated, arms' length transactions, in which the Purchaser has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards.    Neither the Seller nor the Purchaser (to the best of the Seller's knowledge) has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the Sale or the transfer of the Acquired Assets to the Purchaser.

42.    The Seller thus requests that the Court find that the Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assigned Contracts

43.    As required by the Agreement, and in order to enhance the value to the Seller's estate, the Seller requests approval of the potential assumption and assignment of the Assigned Contracts to the Purchaser upon the closing of the transactions contemplated under the Agreement.

44.    Pursuant to the Agreement, the Purchaser is responsible for payment of all cure amounts required to be paid to the counterparties to the Assigned Contracts assumed and assigned by Oceanside (each a "**Counterparty**" and collectively, the "**Counterparties**") under section 365(b)(1) of the Bankruptcy Code.    The Agreement further provide that the Purchaser may elect to delete agreements from the list of Assigned Contracts from the APA, at any time up to and prior to the Closing.

45.    The Assigned Contracts are those contracts or leases that are to be assumed by the Seller and assigned to the Purchaser as part of the sale transaction under each of the Agreement. The Seller further request that the Sale Order provide that the Assigned Contracts will be

21

assigned to, and remain in full force and effect for the benefit of, the Purchaser, notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

46.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

47.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an

executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D. N.Y. 1986). The potential assumption and assignment of the Assigned Contracts, or any of them, set forth in the Agreement, will be a necessary part of the deal that the Seller has struck with the Purchaser and, as stated above, will benefit the Seller's estate.

48.     With respect to Assigned Contracts to be potentially assumed and assigned, the Seller has or will send the Cure Notices via federal express or overnight delivery wherever possible to all Counterparties concurrently with the filing of this Sale Motion, thereby notifying such counterparties of the potential assumption by the Seller's and assignment to the Purchaser of the Assigned Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts owing on each of the Assigned Contracts, according to the Seller's books and records and shall be the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code ("**Cure Amounts**"). The Seller proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of its Assigned Contracts to Purchaser or adequate assurance of future performance be filed before, or raised at, the Sale Hearing.

49.     Counterparties to the Assigned Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease counterparty. The payment of the Cure Amounts specified in

DOCS_SF:86586.6 87714/002

the Cure Notices (or a different amount either agreed to by the Purchaser or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless either of the Seller determines (with the consent of the Purchaser) that a particular lease or contract is not truly executory, and does not need to be cured to transfer the lease or contract to the Purchaser under the terms of the applicable purchase agreement.

50.    Cure Amounts disputed by any counterparty will be considered by the Court either at the Sale Hearing or at some later date as may be scheduled by the Court to determine contested objections regarding Cure Amounts that have not been resolved in advance or at the Sale Hearing. With respect to the payment of Cure Amounts, the Purchaser shall bear and pay the entire amount of such cure costs.

51.    The Purchaser is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contract. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If necessary, the Purchaser shall provide evidence of

24

its ability to provide adequate assurances to counterparties to the Assigned Contracts at the Sale Hearing.

### Notice

52.     Notice of this Sale Motion will be provided to (a) the Office of the United States Trustee; (b) all of the Seller's creditors; (c) all parties who are known by the Seller to assert liens with respect to the Acquired Assets, if any; (d) all counterparties to the Assigned Contracts; (e) the Purchaser and its counsel; (f) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (g) counsel to the Committee.  The Seller respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

53.     The Seller requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

### Conclusion

54.     The Seller's proposed sale of the Acquired Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary, and serves the best interests of the Seller and its estate.  The Seller thus request that the Court approve the proposed Sale of the Acquired Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to the Purchaser.

WHEREFORE, the Seller respectfully requests that this Court (i) grant this Sale Motion and authorize the sale of the Acquired Assets to the Purchaser and approve the Agreement, pursuant to the attached proposed order; (ii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments of the Assigned Contracts; and (iii) grant such other and further relief as is just and proper.

Dated: November 19, 2014

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra I. Grassgreen (CA Bar No. 169978)
James E. O'Neill (Bar No. 4042)
Joshua M. Fried (CA Bar No. 181541)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:          jpomerantz@pszjlaw.com
                 joneill@pszjlaw.com
                 jfried@pszjlaw.com


Counsel to Debtors and Debtors in Possession

26